Jan P. OTTO, Joel C. Otto, and Nathan C. Otto, Respondent Below Appellants,

v.

Robert W. GORE, Virginia G. Giovale, David W. Gore, Elizabeth W. Snyder, Scott A. Gore, Thomas K. Gore, Sharon G. Rubin, Brian W. Gore, Peter R. Giovale, Daniel G. Giovale, Michael A. Giovale, Mark N. Giovale, Romy Chen Gore, Jeffrey Chen Gore, Emily Chen Gore, Ryan Chen Gore, Bret A. Snyder, Keith A. Snyder, Sean A. Snyder, and Kelly J. Snyder, Respondents Below Appellees.

Susan W. Gore, Petitioner Below Appellant,

v.

Robert W. Gore, Virginia G. Giovale, David W. Gore, Elizabeth W. Snyder, Scott A. Gore, Thomas K. Gore, Sharon G. Rubin, Brian W. Gore, Peter R. Giovale, Daniel G. Giovale, Michael A. Giovale, Mark N. Giovale, Romy Chen Gore, Jeffrey Chen Gore, Emily Chen Gore, Ryan Chen Gore, Bret A. Snyder, Keith A. Snyder, Sean A. Snyder, and Kelly J. Snyder, Respondents Below Appellees.

Jan C. Otto, Respondent Below Appellant,

v.

Susan W. Gore, Petitioner Below Appellee,

v.

Robert W. Gore, Virginia G. Giovale, David W. Gore, Elizabeth W. Snyder, Scott A. Gore, Thomas K. Gore, Sharon G. Rubin, Brian W. Gore, Peter R. Giovale, Daniel G. Giovale, Michale A. Giovale, Mark N. Giovale, Romy Chen

Gore, Jeffrey Chen Gore, Emily Chen Gore, Ryan Chen Gore, Bret A. Snyder, Keith A. Snyder, Sean A. Snyder, Kelly J. Snyder, Jan P. Otto, Joel C. Otto, and Nathan C. Otto, Respondents Below Appellees.

C.A. Nos. 559, 2011, 582, 2011, 589, 2011.

Supreme Court of Delaware.

Submitted: April 4, 2012.
Decided: May 22, 2012.

Peter S. Gordon, Grover C. Brown (argued), and William Kelleher, Gordon, Fournaris & Mammarella, P.A., Wilmington, Delaware for appellants Jan P. Otto, Joel C. Otto and Nathan C. Otto.

Allen M. Terrell, Jr., W. Donald Sparks, II (argued), Chad M. Shandler, and Allison M. Camara, Richards, Layton & Finger, P.A., Wilmington, Delaware for appellant Susan W. Gore.

Jason C. Powell (argued) and Thomas R. Riggs, Ferry, Joseph & Pearce, P.A., Wilmington, Delaware for appellant Jan C. Otto.

Collins J. Seitz (argued), Seitz Ross Aronstam & Moritz LLP, Wilmington, Delaware; Gregory J. Weinig and Scott E. Swenson, Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware for appellees Scott A. Gore, Thomas K. Gore, Sharon G. Rubin, Brian W. Gore, Peter R. Giovale, Daniel G. Giovale, Michael A. Giovale, Mark N. Giovale, Romy Chen Gore, Jeffrey Chen Gore, Emily Chen Gore, Ryan Chen Gore, Bret A. Snyder, Keith A. Snyder, Sean A. Snyder, and Kelly J. Snyder.

David E. Ross, Seitz Ross Aronstam & Moritz LLP, Wilmington, Delaware; David A. Jenkins, Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware; Of Counsel: Mark C. Hansen, Derek T. Ho (argued), and Michael N. Nemelka, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., attorneys for appellees Robert Gore, Virginia Giovale, David Gore, and Elizabeth Snyder.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices constituting the Court en Banc.

STEELE, Chief Justice:

Acting as settlors, Wilbert and Genevieve Gore signed two separate trust instruments in 1972—the "May Instrument" and the "October Instrument"—both purporting to transfer the same property into the "Pokeberry Trust." Susan Gore, one of their daughters, claims that the earlier May Instrument controls while the other four siblings contend that the settlors never intended the May Instrument to be final and enforceable. The Vice Chancellor rejected Susan's claims. Susan and her children (including Jan C. Otto, her adopted child), raise five arguments on appeal: (1) the May Instrument controls, making the October Instrument a nullity; (2) Jan. C. Otto is a grandchild beneficiary of the trust; (3) the Pokeberry Trust formula should be disregarded because it is flawed; (4) a "mediation agreement" is enforceable; and (5) Jan C. Otto is entitled to specific performance and unjust enrichment. We find that none of these claims has merit, and affirm.

## I. FACTUAL AND PROCEDURAL HISTORY[1]

Wilbert ("Bill") and Genevieve ("Vieve") Gore founded W.L. Gore and Associates, Inc.[2] in 1958. The privately held manufacturing company is headquartered in Newark, Delaware and best known for its GORE–TEX ® fabric.

In 1962, the Gores gave their five children (Robert, Susan, Virginia, David, and Elizabeth) 2,200 shares of Gore stock each. Two years later, the Gores established an irrevocable trust for their children, which distributed another 1,700 shares of Gore stock to each child. By 1965, the Gores

---

**1.** The factual history is taken from the facts section in the opinion below.

**2.** W.L. Gore and Associates, Inc. is sometimes referred to herein as "the Company."

had given each of their children a total of 3,900 Gore shares.

## A. The Estate Problem

In 1971, W.L. Gore and Associates announced the formation of an industrial products group to sell GORE–TEX®. Bill Gore expected the value of Gore stock to grow tenfold over the next ten years. If Bill and Vieve were to suddenly pass away, the passage of highly valued Gore stock to the next generation would trigger massive estate taxes. Paying these taxes would force the sale of large amounts of stock and jeopardize the Company's privately held status.

To avoid that, Bill Gore, in a November 1971 letter to his lawyer, proposed a plan to prepare for the growth and future transfer of Gore stock to his children. The plan involved: (1) the Gores placing most of their Company stock into a holding company; (2) the holding company issuing preferred stock that would reduce the value of the common stock to almost nothing; and (3) the holding company transferring its common stock to a family trust for the Gore's grandchildren. This plan would avoid incurring significant gift tax at the time of transfer, and if the stock appreciated in value, the gains would be realized by the trust rather than by the Gores' estates.

The November 1971 letter described the intended distribution of trust assets to the Gore's "Grandkids."[3] Specifically, "the trust [would be] distributed into individual trusts when the youngest grandchild reaches 21 years, in a fashion that as nearly as possible *equalizes Gore stock and Gore stock expectations from parents and trusts which the grandchildren can be expected to benefit.*"[4]

An informal discussion with an unidentified person at the U.S. Internal Revenue Service (IRS) indicated that the Gores could solve their estate tax concerns by transferring their Gore stock to a holding company, and thereafter transferring the holding company stock to a family trust. The lawyer suggested obtaining a letter ruling from the IRS blessing the plan, but Bill did not want to wait. Were Bill and Vieve to suddenly pass away before addressing this estate problem, massive estate taxes would be triggered.

## B. The "Placeholder" and the Final

Bill and Vieve Gore formed Pokeberry Hill Securities, Inc., the holding company, on January 28, 1972. Months later, the Gores sent another letter to their lawyer summarizing their understanding of the proposed trust. As described in the letter, the grandchildren would receive a total of 7,000 shares of Gore stock based on the following parenthetical:

> (their interest in the trust to be such as to equalize the Gore stock 'expectations' at the time of the death of the last of G.W.G. or W.L.G. or at the time our daughter Betty reaches 45 years of age (or May 2, 1992) whichever occurs last)—note: so that all our Grandkids are born.[5]

Soon afterwards, the Gores acquired 1,000 shares of Pokeberry common stock in exchange for 7,000 shares of Gore common stock.

On May 8, 1972, the Gores signed, before two witnesses and a notary public, the May Instrument titled "Trust for the Grandchildren of Wilbert L. and Genevieve W. Gore." Schedule A of the May Instru-

---

**3.** JX 62, Letter from Bill Gore to Converse Murdoch, Nov. 18, 1971.

**4.** *Id.*

**5.** JX 71, Memo from Bill and Vieve Gore to Converse Murdoch, Apr. 3, 1972.

ment lists "1000 shares of Common Stock of POKEBERRY HILL SECURITIES, INC." as the property of the purported trust. The settlers, however, did not initial Schedule A. Under the terms of the May Instrument, a large percentage of the trust corpus would need to be sold to pay estate taxes, but the remainder would be evenly divided among all of the Gore grandchildren.[6] The Court of Chancery opinion described the May Instrument as a "placeholder."[7]

The next day, Bill wrote a letter describing the distribution of trust assets to his grandchildren based on the Pokeberry formula—a formula that was contrary to the terms of the May Instrument. The letter states:

> At termination, we would like to establish the shares in this trust for each grandchild to equalize as nearly as possible the expectations of Gore stock of each grandchild. For this purpose we consider that each of our grandchildren have an expectation of sharing in 3,900 shares of Gore stock from their parents . . .[8]

This May 9 Letter was the last written reference that the Gores ever made to the May Instrument. After the May 9 letter was sent, the May Instrument disappeared into a file and was never discussed with any of the family members.

Following discussions in the summer of 1972, Bill proposed the final version of the Pokeberry formula in a letter to his attorney dated August 10, 1972. To equalize the expectations of the grandchildren, the formula first set 26,500 as the total shares to be given to all of the grandchildren (3,900 for each child plus 7,000 from the trust). Then, the total number of shares would be divided by the number of grandchildren (19). The result is the target number of 1,395 shares, which the Gores wanted each grandchild to have at the end of the day.

On October 16, 1972, the Gores signed, before a notary public, the October Instrument titled "Trust for Grandchildren of Wilbert L. and Genevieve W. Gore."[9] Schedule A of the October instrument lists 1,000 shares of Pokeberry common stock. Unlike the May Instrument, the October Instrument also bears the initials "W.L.G. and G.W.G."[10] The Pokeberry formula is incorporated into the October Instrument. The October Instrument also includes language indicating that the Gores intended for the Pokeberry formula to assume that each of their five children would pass on 3,900 shares to their own respective children, even if that assumption was not true: "We emphasize that for purposes of the division into shares there be a conclusive presumption that each grandchild will share with his siblings 3,900 of assets de-

---

6. JX 78, May 8, 1972 Trust for Grandchildren of Wilbert L. and Genevieve W. Gore ("the principal and any undistributed income shall be divided into shares with one share for each grandchild of trustors then alive and one share for grandchild who is then dead but who has then living issue.") (the "may Instrument").

7. *In re Trust for Grandchildren of Wilbert L.*, 2011 WL 3444569, at *19 (Del.Ch. July 29, 2011) ("The Gores intended to use the May 1972 Trust as a mere placeholder that would give the Gores' estate some protection from

estate taxes until a document that would better accomplish their goals could be drafted and executed;").

8. JX 80, Letter from Bill Gore to Converse Murdoch, May 9, 1972.

9. JX 90, October 16, 1972 Trust for Grandchildren of Wilbert L. and Genevieve W. Gore (the "October Instrument").

10. *Id.* at ES 102 000087.

rived from us even though in fact this is not so."[11]

When executing the October Instrument, the Gores not only signed two originals but also they placed blue backers thereon to indicate that those originals were the final trust instruments.[12] The Gores also initialed Schedule A of the originals,[13] returned a conformed copy to their lawyer,[14] and requested a taxpayer identification number from the IRS.[15] They followed none of these procedures for the May Instrument. Over the next forty years, the settlors, trustees, and beneficiaries all believed that the October Instrument governed the Pokeberry Trust.

### C. Nouveaux Riches to Unsustainable Wealth

Susan Gore married Jan C. Otto and had three children: Nathan, Jan P., and Joel Otto (the Otto Grandchildren). During the marriage, Susan sold a portion of her Gore stock in order to support the family. The marriage ended in divorce and left Susan in a difficult position. Until 1995, she participated in the Transcendental Meditation movement, which left her in "very, very bad shape."[16] After leaving the movement, Susan spent three years convalescing in a series of monasteries. By the end of the 1990s, Susan was facing the possibility of personal bankruptcy.

In a 1999 letter to Vieve, Susan asked her mother to release 368 shares of Gore stock in order to allow her to "participate in the lifestyle of her family and be a better contributor."[17] Vieve authorized, over the objections of Robert Gore and trust advisor Roy Kinsey, the release of 336 shares from the 1964 Trust to Susan.

Around this time, the Otto Grandchildren started taking a more active interest in the disposition of the trust assets. In 2001, Nathan Otto, one of these grandchildren, wrote a paper titled "Tangible Effects of the Belief Space: Making a Successful Transition from Nouveaux Riches to Sustainable Wealth," which he circulated among the members of the Gore family.[18] In the paper, Nathan argued that the family's belief that "[a]nything above a middle-class lifestyle is ostentatious, wasteful and bad … keeps the family fragmented and working, keeps [family members] from working together due to time, work, and travel constraints. Violates the birthright of wealth."[19] By January 2002, Nathan had developed a plan for the Company that would enable the Company to go public yet maintain the family's control through super-voting stock.

### D. A Firm "No"

On May 17, 2002, Nathan wrote an email to Susan explaining the distribution rules of the Pokeberry Trust:

> Upon Vieve's death, the trust is divided into one trust for each grandchild. In the division, there is a calculation to equalize the distribution to each grandchild, with a firm presumption that each

---

11. *Id.* at ES 102 000078.

12. *Id.* at ES 102 000076.

13. *Id.* at ES 102 000087.

14. JX 88, Letter from Genevieve Gore to Converse Murdoch, October 16, 1972.

15. JX 91, Letter from Genevieve Gore to IRS, October 16, 1972.

16. Trial Tr. (Susan) 40–41.

17. JX 131, Letter from Susan to Vieve, July 18, 1999.

18. JX 141.

19. *Id.*

grandchild shares equally in 3,900 shares given to each of the five children.

In the calculation, Pokeberry is added to 3,900 shares for each of the five siblings for a total of 26,500 shares. This total of 26,500 is then divided by the number of grandkids to arrive [at] an equalization number. With 19 grandkids, this number is 1,395.

Then, for each of the five siblings, the number of kids they have is divided into the 3,900 they were given, and then Pokeberry shares are used to add in until the total reaches 1,395.

So for instance, Bob was allocated 3,900 shares, and he has four kids. His 3,900 shares are presumed to be equally divided among his kids to reach 975 shares apiece. Then, 420 Pokeberry shares are added in to make up the total to 1,395 per child.

Because each of your siblings has four children, the calculation is the same for everyone except the Ottos. For the Ottos, 3,900 is divided among three children, making 1,300 presumed to be inherited from you. Then the Pokeberry shares are added into make the total 1,395: 95 share per Otto boy.

So there you have it: 420 shares for each grandchild except the Ottos, who would receive 95 each.

If you had one more child before Vieve's death, then the calculation would even out among all the branches, each of the 20 grandchildren would receive 350 shares from Pokeberry.

The difference to the Otto branch of three vs four children is 285 shares vs 1,400 shares, a difference of 1,115 shares of Gore stock.... The hypothetical fourth child would also receive 350 shares, of course.[20]

Several days later, Nathan suggested that Susan adopt her granddaughter Jenna Otto. Jan C. objected to the idea, and Susan dropped Jenna as a candidate.

Vieve Gore celebrated her birthday on March 13, 2003. At the party, Nathan made a forceful and passionate appeal to Vieve to change the Pokeberry formula.[21] Despite Nathan's plea, Vieve gave Nathan a firm "no."[22] After failing to obtain unanimous consent from the other grandchildren or the backing of Vieve, the Otto Grandchildren decided to proceed with an adoption. Two weeks after the birthday party, Susan's ex-husband, Jan C., jokingly suggested that Susan adopt him.

That suggestion quickly generated serious discussion. On April 18, Nathan informed Jan C. that Susan wanted to move forward with the adoption. The next day, Susan wrote to Jan C. and Nathan to explain that "[t]he financial benefit to [Jan C.] would be nice, but not substantial ..."[23] In response, Jan C. wrote that he "did not expect any financial benefit from Pokeberry should the adoption actually occur ... The only thing I ask is that I not incur any out-of-pocket expenses as this proceeds."[24]

Suspicious of Jan C.'s motivations, Susan asked Jan C. why he was willing to be adopted. Jan C. responded that he be-

20. JX 154, Email from Nathan to Susan, May 17, 2002 (handwritten notes omitted).

21. Trial Tr. (Susan) 166–67; Vieve became very upset and told Susan later that "It almost killed me." *Id.* at 21.

22. JX 204, Mem. From Nathan to Susan, Jan C., Jan P., and Joel, April 28, 2003.

23. JX 200, Email from Susan to Jan C. and the Otto Grandchildren, Apr. 19, 2003.

24. JX 201, Email from Jan C. to Susan, Nathan, and Joel, Apr. 21, 2003.

lieved the October Instrument was seriously flawed and that he wanted to achieve a more equitable distribution for his children. Again, Jan C. represented that any income or principal he received from the trust would be distributed to the grandchildren, less taxes or expenses incurred.

Eventually, Susan agreed to adopt Jan C. On June 30, 2003, she filed a Petition for Final Decree of Adoption of Adult Person in a Wyoming state court. Her ex-husband's adoption became final on July 10, 2003. At the time, Jan C. Otto was 65 years old.[25]

### E. A Change of Heart

Five days after being adopted, Jan C. began to contemplate keeping the distributions from the Pokeberry Trust for himself. Seven days after being adopted, he decided to modify the original plan for distributing the trust corpus to include his other stepsons, nieces and nephews. By the end of 2004, Jan C. had decided to keep all of the income from the Pokeberry Trust for himself.

Susan and the Otto Grandchildren discovered Jan C.'s change of heart in January 2005. In response, Susan wrote to her sons asking whether she should "un-adopt" Jan C. Before Susan could take action, however, Genevieve Gore passed away on January 20, 2005. The next month, Susan's four siblings received notice of the adoption.

On March 10, 2005, Susan filed a Petition for Construction with the Court of

Chancery. During the discovery phase, the May Instrument was located among Bill's papers. The May Instrument appeared to have created an irrevocable trust with respect to the same stock that had been transferred under the October Instrument. Under the terms of the May Instrument, a large percentage of the trust corpus would have to be sold to pay estate taxes but the remainder would be divided evenly among the Gore grandchildren.

A mediation conducted in 2007 failed to produce an agreement binding on all of the parties. The Vice Chancellor then bifurcated the action with respect to Jan C. Otto and held, in the first opinion, that Jan C. was barred from claiming any personal economic benefit in the Pokeberry Trust by the unclean hands doctrine.[26] In the second opinion, the Vice Chancellor held that the October Instrument governed the Trust, the Pokeberry formula was valid, the mediation agreement was unenforceable, and that Jan C. Otto is not a grandchild for purposes of the Trust and not entitled to specific performance or damages as remedies for unjust enrichment.[27]

### II. STANDARD OF REVIEW

The party asserting existence of a trust bears the burden of demonstrating that the acts of the alleged settlor are sufficient to create a trust.[28] In order to meet this burden, the party must prove the existence of a trust with clear and convincing evidence.[29] The Vice Chancellor found that appellants met their burden

---

25. JX 219, Jan C. Otto's Consent to Adoption by Susan W. Gore Pursuant to Wyoming Statute § 1–22–113.

26. *In re Trust for Grandchildren of Wilbert L. and Genevieve W. Gore.,* 2010 WL 3565489, at *6 (Del.Ch. Sept. 1, 2010).

27. *In re Trust for Grandchildren of Wilbert L.,* 2011 WL 3444569, at *30.

28. George T. Bogert, *Trusts* § 11, at 26 (6th ed.1987).

29. *Levin v. Smith,* 513 A.2d 1292, 1296 (Del. 1986); *Bradford v. Vinton,* 153 A. 678, 684 (Del.Ch.1930); *Sadowski v. Rykaczewski,* 147 A. 249 (Del.Ch.1929).

by holding "the Gores intended to create, and did create, a trust (the "May 1972 Trust") when they affixed their signatures to the May Instrument." [30]

■ Whether a declaration to become a trustee "was intended to create a trust is always a *question of fact*, depending upon the circumstances." [31] Therefore, we review the Vice Chancellor's factual finding that the Gores intended to create a trust under the clearly erroneous standard. [32]

## III. ANALYSIS

■ Bogert on Trusts states that the settlor must form an intent to create a trust in order for the trust to be enforceable. [33] Delaware has adopted the rule that a party seeking to prove an express trust must demonstrate an intent to establish such a trust. [34] In *Bodley v. Jones*, we held that "the authorities are agreed that in order to create an express trust the intention to do so must be evidenced." [35]

Under the Restatement of Trusts, the required manifestation of intention to create a trust may be expressed in writing or by conduct. [36] We reaffirmed in *Levin v. Smith* that the intent to create a trust can be demonstrated "by definite, explicit and unequivocal words, or by circumstances so revealing and compelling as to manifest the intention with all reasonable certainty." [37] The explicit words of the trust will typically manifest the same intention as the circumstances and conduct that surrounds its creation. This case, however, presents the atypical situation, where the extrinsic evidence contradicts the written manifestation of intent.

**A. The Gores did not form the intent to create a final, enforceable trust when they signed the May Instrument.**

■ When determining whether a settlor has formed the requisite *intent to create* a final, enforceable trust, courts look to intrinsic and extrinsic evidence. [38] Intrinsic evidence is defined as "evidence existing within a writing." [39] In the trust

---

**30.** *In re Trust for Grandchildren of Wilbert L.,* 2011 WL 3444569, at *17.

**31.** *Delaware Trust Co. v. Fitzmaurice,* 31 A.2d 383, 390 (Del.Ch.1943) (citing *Jones v. Bodley,* 27 A.2d 84 (Del.Ch.1942)) (emphasis added).

**32.** *Palozie v. Palozie,* 283 Conn. 538, 927 A.2d 903, 911–12 (2007).

**33.** Bogert, *supra* note 28, at 24 ("The intent to have a trust must not only be formed in the mind of the settlor but must also be expressed by reducing his intent to writing or by communicating it to another.").

**34.** *Cravero v. Holleger,* 566 A.2d 8, 14 (Del.Ch. 1989) ("one seeking to prove an express trust must demonstrate the intent to create such a trust").

**35.** *Bodley v. Jones,* 32 A.2d 436, 438 (Del. 1943).

**36.** RESTATEMENT (THIRD) OF TRUSTS § 13 (2003) ("the required manifestation of intention to

create a trust may be by written or spoken words or by conduct").

**37.** *Levin v. Smith,* 513 A.2d 1292, 1297 (Del. 1986) (quoting *Bodley v. Jones,* 32 A.2d 436, 438 (Del.1943)).

**38.** *In re Estate of Daniels,* 665 P.2d 594, 595 (Colo.1983) ("The settlor must manifest such intent by objective expressions such as written documents, words and conduct, and the settlor's subjective thoughts and beliefs are not relevant.") (citing A. Scott, *Trusts* § 23 (1967)); *see also* RESTATEMENT (THIRD) OF TRUSTS § 21 (2003) ("Similarly, if property is transferred to a person "as trustee" or "in trust," without stating the terms of any trust, the parol-evidence rule does not prevent the admission of extrinsic evidence intended to complete the terms of the apparent trust or even to show that no express trust was intended to be created.").

**39.** *Black's Law Dictionary* 597 (8th ed.2004).

context, this type of evidence refers to the trust instrument itself. Extrinsic evidence is defined as "evidence relating to a contract but not appearing on the face of the contract because it comes from other sources."[40] This type of evidence, for example, would include the circumstances surrounding the creation of the trust and the conduct of the settlors.

Generally, courts cannot consider extrinsic evidence relating to the meaning of specific terms in a written trust instrument to interpret those terms.[41] Extrinsic evidence, however, is properly considered to determine the issue of *intent to create* a trust.[42] This subtle difference is critical to our holding. Extrinsic evidence may relate either to whether the trust has been formed or to the meaning of specific terms. The former use of extrinsic evidence is permitted; the latter is prohibited where the trust language is clear and unambiguous.

The parol evidence rule recognizes this distinction[43] and does not preclude the use of extrinsic evidence to resolve the question of intent to create a final, enforceable trust.[44] In *Addy v. Piedmonte*, the Vice Chancellor specifically noted the use of "extrinsic evidence to discern if the contract is completely or partially integrated."[45] In *Galantino v. Baffone*, we recently approved the use of extrinsic evidence, because it did not implicate the concerns underlying the parol evidence rule—that the evidence would be considered for the purpose of varying or contradicting the express terms of the writing.[46]

### 1. Intrinsic manifestations of intent

The signatures on the May Instrument provide evidence that the Gores intended to create a trust. *In re Estate of Daniels*, the Colorado Supreme Court held that the "signing of the trust agreement, in itself entirely regular, is a very strong outward manifestation of an intent to create the trust."[47] The May Instrument

---

**40.** *Id.*

**41.** When trust language is ambiguous, this Court has found an exception to the rule. *See Dutra de Amorim v. Norment*, 460 A.2d 511 (Del.1983) (finding the term "issue" ambiguous and using extrinsic evidence to interpret the term); *Annan v. Wilmington Trust Co.*, 559 A.2d 1289 (Del.1989) (finding the term "issue" undefined and holding that the settlor's intent be determined "in light of the circumstances surrounding its creation"); *Chavin v. PNC Bank*, 816 A.2d 781 (Del.2003) (finding the phrase "if he shall then be living" ambiguous and ruling that the settlor's intent be determined "in light of the circumstances surrounding its creation").

**42.** *Cravero v. Holleger*, 566 A.2d 8, 14 (Del.Ch. 1989) ("one seeking to prove an express trust must demonstrate the intent to create such a trust by definite explicit and unequivocal words, or by circumstances so revealing and compelling as to manifest the intention with all reasonable certainty.").

**43.** RESTATEMENT (THIRD) OF TRUSTS § 21 (2003) ("That extrinsic evidence is admissible in de-

termining whether the parties intended an integrated document").

**44.** *Porreca v. Gaglione*, 358 Mass. 365, 265 N.E.2d 348 (1970); *see also* Scott, *supra* note 38, at § 38.

**45.** *Addy v. Piedmonte*, 2009 WL 707641, at *9 (Del.Ch. Mar. 18, 2009); *see also Middletown Concrete Products, Inc. v. Black Clawson Co.*, 802 F.Supp. 1135, 1143 (D.Del.1992) ("[i]n deciding whether a writing is final the most important issue is the intent of the parties.") (quoting *Sierra Diesel Injection Service v. Burroughs Corp.*, 890 F.2d 108, 112 (9th Cir. 1989)).

**46.** *Galantino v. Baffone*, 2012 WL 1301221, at *4 (Del. Apr. 16, 2012).

**47.** *In re Estate of Daniels*, 665 P.2d 594, 596 (Colo.1983).

was signed, witnessed, and notarized on May 18, 1972.[48] The Gores must have known that those actions carried legal significance, which suggests that they intended to create a trust when they signed the document.

The terms of the May Instrument are additional manifestations of intent to form a trust. As the Court of Chancery held in *Jones v. Bodley,* technical and formal words are of "great importance" in determining the actual intent of the settlor.[49] In this case, the May Instrument was titled "Trust for Grandchildren of Wilbert L. and Genevieve W. Gore," and included the following statement: "Wilbert L. Gore and Genevieve W. Gore … hereby transfer to themselves as trust fiduciaries the property set forth in Scheduce [sic] A attached to and made part of this instrument."[50] When viewed in isolation, these written manifestations support the finding that the Gores intended to create a trust when they signed the May Instrument. But that does not conclude our analysis, because we must also consider the extrinsic evidence contained in the record.

### 2. Extrinsic manifestations of intent

 Extrinsic manifestations of intent include evidence that relates to the trust formation but does not appear on the face of the trust instrument. According to the Restatement of Trusts, "[a]cts or communications prior to and subsequent to, as well as those contemporaneous with, the transfer or other act that is claimed to create a trust may be relevant in determining whether a property owner had the requisite intention to create a trust."[51]

 The Vice Chancellor made various factual findings on the question of whether the trust purportedly created by the May Instrument was revocable. The issue before him, we believe, did not concern the revocation of a valid trust but rather whether the Gores intended the May Instrument to create a final and legally binding trust at all.[52] We accept the following factual findings and apply them to the question of whether the Gores intended to thus finalize the May Instrument.

 First, the Vice Chancellor found that "the Gores never told anyone" about the May Instrument.[53] According to well-settled law, choosing not to communicate the existence of the trust to anyone is evidence that the settlor has not formed a definite, present intention to create a trust.[54] This type of extrinsic evidence is "some but not conclusive evidence that the property owner did not intend immediately

---

**48.** *In re Trust for Grandchildren of Wilbert L.,* 2011 WL 3444569, at *17.

**49.** *Jones v. Bodley,* 27 A.2d 84, 86 (Del.Ch. 1942).

**50.** *In re Trust for Grandchildren of Wilbert L.,* 2011 WL 3444569, at *17.

**51.** RESTATEMENT (THIRD) OF TRUSTS § 13 (2003).

**52.** The intent to create a trust must be measured at the time when the purported trust is formed. Extrinsic evidence that the settlors changed their minds after the fact is not relevant to the issue of whether the settlor had the requisite intent at the time of formation.

**53.** *In re Trust for Grandchildren of Wilbert L.,* 2011 WL 3444569, at *18.

**54.** RESTATEMENT (THIRD) OF TRUSTS § 13 (2003) ("The failure of a property owner (other than a testator) to communicate such an intention to anyone, however (such as the failure to hand anyone the instrument an owner had drawn up declaring an intention to hold certain property in trust), is some, but not conclusive, evidence that the property owner had not arrived at a definite, present intention to create a trust.").

to create a trust."[55] We hold that the Gores' failure to disclose the existence of the trust to anyone, while strong, is by itself insufficient evidence to establish that the Gores did not intend to finalize the May Instrument so as to create a legally binding trust.

Second, Bill and Vieve Gore "did not employ the same formal procedure they used when signing other irrevocable trusts both before and after this date."[56] For each of the 27 other trusts the Gores executed during their lifetime, they: (i) signed two originals not just one, (ii) placed a colored backer on the signed originals to indicate that it was a final trust instrument, (iii) initialed Schedule A of the originals, (iv) sent a conformed copy to their lawyer, and (v) requested a taxpayer identification number from the IRS. The Gores followed none of these procedures for the May Instrument. Where the settlors have followed a consistent pattern of formalities when creating trusts and do not follow that pattern with regard to a specific trust, that inconsistent conduct is evidence that the settlors did not intend to create that specific trust. The absence of formalities in connection with initializing the May Instrument supports a finding that the Gores had no intention to finalize the May Instrument.

The absence of initials on Schedule A of the May Instrument deserves further elaboration. Schedule A lists the property to be transferred from the Gores to the trust. The May and October Instruments both list "1000 shares of Common Stock of POKEBERRY HILL SECURITIES, INC." as the property to be transferred, but only the October Schedule A bears the initials "W.L.G." and "G.W.G." By not initialing the May Schedule A, the Gores did not intend to finalize the transfer of property into the May Instrument, and therefore, they never funded the May Instrument's purported trust.

Third, the Vice Chancellor concluded that "the Gores intended for the May 1972 Trust to serve as a placeholder that would provide their estate some protection from taxes in case something happened to them before they could draft a trust instrument that more accurately reflected their intentions."[57] A placeholder, by definition, cannot establish a settlor's intent to create a finalized, enforceable trust.

Fourth, extrinsic evidence before and after execution of the May Instrument led the Vice Chancellor to correctly conclude that the Gores "maintained a consistent view that their assets should be distributed to their grandchildren according to a formula that would account for stock that the grandchildren would be presumed to receive from their parents, as well as what they would receive from the trust and from all other sources."[58] Rather than equalize each grandchild's expectations, the May Instrument would have distributed the trust assets *per stirpes*.[59] Because the May Instrument failed to achieve the Gores' long held estate planning objectives, that further evidences the absence of any present intention to create a final, enforceable trust under the May Instrument.

**55.** Restatement (Third) of Trusts § 14 cmt. c (2003).

**56.** *In re Trust for Grandchildren of Wilbert L.*, 2011 WL 3444569, at *18.

**57.** *Id.*

**58.** *Id.* at *19.

**59.** Black's Law Dictionary defines *per stirpes* as "proportionately divided between beneficiaries according to their deceased ancestor's share." *Black's Law Dictionary* 1181 (8th ed.2004).

One piece of extrinsic evidence is particularly persuasive. On May 9, 1972, Bill sent a letter to his lawyer requesting that the trust "*equalize* as nearly as possible to the expectations of Gore stock." That request was contrary to the *per stirpes* scheme of distribution in the May Instrument.[60] At the end of his letter, Bill also referred to the May Instrument as a draft: "Until termination the grandchildren would share equally in the income (as now drafted)."[61] Conduct by the Gores inconsistent with the existence of a final, operative trust is additional, strong evidence that the Gores did not intend to create a final trust when they signed the May Instrument. Susan and the Otto Grandchildren contend that the Gores in fact intended to create the trust on May 8, but simply changed their minds the next day, but the Vice Chancellor specifically rejected this contention and found otherwise.[62] We agree with the Vice Chancellor's factual finding.

*In re Estate of Daniels* is instructive on the analysis of intrinsic and extrinsic evidence to determine a settlor's intention to create a trust. The settlor in *Daniels* signed a trust agreement but did not fund the trust, disclose the trust to the co-trustee, or notify the beneficiaries. The trial court found that the putative settlor never created a trust. The intermediate appellate court reversed. The Supreme Court of Colorado reversed and upheld the trial court, holding that the trust never took effect because the settlor lacked the intent to create a trust:

As this summary of the evidence reflects, different aspects of Daniels' conduct may be focused upon to support opposite conclusions regarding her intent. Her signing of the trust agreement, in itself entirely regular, is a very strong outward manifestation of an intent to create the trust, but other significant evidence of her conduct and words both before and after signing the agreement support the trial court's decision.[63]

The record here contains conflicting evidence regarding the Gores' intent. Although the Gores signed the May Instrument, they similarly failed to tell anyone affected about the trust or to affix Schedule A with their initials to formalize the transfer of property to the purported trust. Given the extrinsic evidence the Vice Chancellor considered, but not for the purpose of determining whether the Gores intended to create a trust by executing the May Instrument, we conclude the Gores never intended the May Instrument to constitute a final and enforceable trust.

We agree that there is evidence to support the Vice Chancellor's finding that the Gores revoked the May Instrument and superseded it with the October Instrument. The evidence taken in its entirety, however, firmly persuades us that the Gores never formed an intent to create a final and enforceable trust in May of 1972. To the extent the opinion below found otherwise, we reject that finding. Because the Gores never finalized the May Instrument and as a consequence no trust was created, we need not address whether the "May Trust" was revocable. Therefore,

---

**60.** JX 80, Letter from Bill Gore to Murdoch, May 9, 1972.

**61.** *In re Trust for Grandchildren of Wilbert L.*, 2011 WL 3444569, at *19.

**62.** *Id.* ("The letter Bill wrote on May 9 does not indicate, as the Otto Grandchildren and

Susan contend, that the Gores had created an irrevocable trust on May 8 and simply changed their minds on the next day.").

**63.** *In re Estate of Daniels*, 665 P.2d 594, 596 (Colo.1983).

we affirm, although on different grounds, the Vice Chancellor's holding that the October Instrument governs the Pokeberry Trust.[64]

### B. The Pokeberry formula is valid, enforceable, and accurately expresses the Gores' intent.

█ The Otto Grandchildren contend that the Pokeberry formula should not be enforced because it did not carry out the Gores' intention to treat their grandchildren as equally as possible. The central point of contention is whether the Gores intended to divide the shares in the Pokeberry Trust equally *in fact* or instead to use the shares in the Pokeberry Trust to equalize the total amount of shares the formula *presumed* that each grandchild expected to receive.[65]

The Vice Chancellor found that "the Gores intended that the corpus of the Pokeberry Trust be distributed to their grandchildren according to the Pokeberry formula, which would equalize the expectations of the grandchildren when taking into account both the shares of Pokeberry and the 3,900 shares the Gores had given to their children." [66] This finding is supported by the text of the final October Instrument, which states that the principal of the trust shall be distributed "in proportions that, as nearly as possible, *equalize the expectations* (on April 14, 1972) that each of our present and future grandchildren will have." [67]

The description of the Pokeberry formula and the hypothetical case provided in the October Instrument are consistent with an intention to equalize presumed expectations.[68] Before the formation of the Pokeberry Trust, the Gores had already given each of their five children 3,900 shares. The Pokeberry formula assumed that the 3,900 shares would be divided among the grandchildren in each branch of the family. But, that created a problem, in that grandchildren with fewer siblings would receive more shares than grandchildren with more siblings. Robert, Virginia, David, and Elizabeth Gore each had four children, while Susan Gore had only three children. Under the Pokeberry formula, the Otto Grandchildren would receive fewer shares of the Pokeberry Trust to compensate for the extra shares they would expect to receive from Susan.

The majority of Susan's 3,900 shares, however, were no longer available for distribution to her children. This deficit created an even larger gap between the Otto Grandchildren's expectations under the Pokeberry formula and what they would actually receive.[69] The text of the October Instrument recognized this issue but specifically provided no remedy: "we emphasize that for purposes of the division into shares there be a *conclusive presumption* that each grandchild will share with his siblings 3,900 units of assets derived from us *even though in fact this is not so.*" [70]

The Vice Chancellor found as fact that the Gores intended to equalize the expec-

---

**64.** *Unitrin, Inc. v. American General Corp.,* 651 A.2d 1361, 1390 (Del.1995).

**65.** Having held that the Gores did not intend the May Instrument to be an enforceable trust, references to the Pokeberry Trust denote the October Instrument.

**66.** *In re Trust for Grandchildren Wilbert L.,* 2011 WL 3444569, at *25.

**67.** JX 90, October Instrument, ES 102 000078 (emphasis added).

**68.** *Id.* at ES 102 000079.

**69.** *In re Trust for Grandchildren Wilbert L.,* 2011 WL 3444569 at *20.

**70.** JX 90, October Instrument, ES 102 000078 (emphasis added).

tations for each grandchild. The record supports that finding. It demonstrates that the Gores intended to take into account what individual grandchildren would expect to receive from their parents when allocating shares transferred directly by the October Instrument. We therefore uphold the Vice Chancellor's factual finding.

### C. Jan C. Otto is not a "grandchild" of Bill and Vieve Gore for purposes of the Pokeberry Trust.

Jan C. Otto is Susan Gore's ex-husband. Together, they have three sons. On July 10, 2003 Susan Gore formally adopted Jan C. as her fourth son. According to the Vice Chancellor, Susan Gore adopted her 65 year old ex-husband "for the sole, and improper, purpose of thwarting or circumventing the Gores' intentions regarding the Pokeberry Trust" by increasing the amount of shares allocated to Susan's branch of the family.[71] On appeal, Susan and the Ottos claim that the Vice Chancellor erred by not recognizing Jan C. Otto as a grandchild under the Pokeberry Trust.

■■■■ Where a provision of the trust instrument is clear and unambiguous, the court will not consider extrinsic evidence to vary or contradict the ordinary meaning of the provision.[72] Where a term is ambiguous, however, then the settlor's intent controls the interpretation of the term.[73]

"The intent is determined by considering the language of the instrument, read as an entirety, in light of the circumstances surrounding its creation."[74]

In circular fashion, the October Instrument defines a child of any person as a "child, children, or issue of that person by adoption as well as by blood."[75] The term "grandchild" is not defined. Therefore, the Vice Chancellor properly identified the ambiguity as whether a person adopted as an adult for purely strategic reasons, and not for the purpose of creating a parent-child relationship with its attendant emotional ties is a "grandchild" for purposes of the Pokeberry Trust.

■■■■ The Vice Chancellor found as fact that the Gores "did not intend to provide for adult adoptees with whom their children had no parent-child relationship."[76] The record supports this finding. In a memorandum from the Gores to their lawyer, the Gores restated their goals that the class of beneficiaries would close "at the time of the death of the last of G.W.G. or W.L.G. or at the time our daughter Betty reaches 45 years of age (or May 2, 1992) whichever occurs last—note: *so that all our Grandkids are born.*"[77] This language indicates that the Gores considered the grandchildren as minors who were part of and integral to the parent-child relationship.[78] Because Jan C. was 65

---

**71.** *In re Trust for Grandchildren Wilbert L.,* 2011 WL 3444569, at *25.

**72.** *Wilmington Trust Co. v. Annan,* 531 A.2d 1209, 1211 (Del.Ch.1987).

**73.** *Dutra de Amorim v. Norment,* 460 A.2d 511, 514 (Del.1983).

**74.** *Id.* (citing *Chinn v. Downs,* 421 A.2d 915, 920 (Del.Ch.1980)).

**75.** JX 90, October Instrument.

**76.** *In re Trust for Grandchildren Wilbert L.,* 2011 WL 3444569, at n. 205.

**77.** JX 71, Letter from Bill and Vieve Gore to Murdoch, April 3, 1972.

**78.** Typically, extrinsic evidence cannot be applied to interpret specific terms of a trust instrument, but because the term "grandchild" is ambiguous, we are permitted to examine extrinsic evidence to determine the settlor's intent.

years old at the time of his adoption, the Gores did not intend for him, or anyone similarly situated, to benefit from the Pokeberry Trust.

■ To determine the collateral economic consequences of an adult adoption for a trust, we may properly consider the purpose of the adoption. In *Chichester v. Wilmington Trust Co.*, the Court held that "[t]he finality of adoption does not preclude inquiry into its purpose in the context of determining a class of beneficiaries, and the intent or purpose of the testator or trustor can always be examined to determine if he intended to benefit adopted individuals."[79] *In re Adoption of Swanson*[80] further recognized that there are common sense limitations on any adult adoption. By way of example, we noted that "no court should countenance an adoption to effect a fraudulent, illegal or patently frivolous purpose."[81]

In the opinion below, the Vice Chancellor found that Susan and the Ottos pursued the adoption of her ex-husband "for the sole, and improper, purpose of thwarting or circumventing the Gores' intentions regarding the Pokeberry Trust."[82] Nathan Otto attempted to convince Vieve to amend the Pokeberry formula on her ninetieth birthday, but she rebuffed him. Two weeks later, Jan C. Otto jokingly suggested that Susan adopt him. Within four months, Susan formally adopted Jan C. as her son. The timing of the adoption and the background preceding it, are evidence that the adoption was pursued in order to undermine the Gores' intentions. The fact that the Susan kept this adoption secret

until Vieve died further evidences that Susan and the Otto Grandchildren knew that they were acting to thwart Vieve's intentions. Finally, Susan herself testified that the purpose of the adoption was to be "purely a device to even out Pokeberry" a result clearly contrary to the Gores' goal of equalizing expectations.[83]

Even if the adoption is technically proper under Wyoming law—which we assume for purposes of this opinion—that does not require us to recognize Jan C. as a grandchild beneficiary of the Pokeberry Trust. We affirm the Vice Chancellor's holding that, for purposes of the Pokeberry Trust the class of "grandchildren," is limited to the Gore's 19 natural born grandchildren.

### D. The mediation settlement is unenforceable because it was not signed by all of the beneficiaries and co-trustees identified as parties to the agreement.

In 2007, some of the parties engaged in a voluntary mediation, which resulted in a settlement agreement. The Otto Grandchildren claim that the Vice Chancellor erred by failing to enforce that settlement agreement. Court of Chancery Rule 174 states that "if the parties involved in the mediation conference reach agreement with regard to the issues identified in the consent to mediation, their agreement shall be reduced to writing and signed by the parties and the mediator."[84]

■ One representative each of the Otto, David Gore, Robert Gore, Giovale, and Snyder grandchildren branches signed

**79.** *Chichester v. Wilmington Trust Co.*, 377 A.2d 11, 14–15 (Del.1977).

**80.** *In re Adoption of Swanson*, 623 A.2d 1095, 1099 (Del.1993).

**81.** *Id.*

**82.** *Id.* at *25.

**83.** Trial Tr. (Susan) 128 (Q. "This was purely a device to even out Pokeberry, correct?" A. "Yes.").

**84.** Ct. Ch. R. 174.

the settlement agreement. The remaining grandchildren, however, did not sign.[85] Moreover, none of the contingent beneficiaries of the Pokeberry Trust—the great grandchildren—were represented at the mediation, and no one on their behalf validly agreed to the proposed share allocation.[86] Finally, although the settlement agreement purports to include the co-trustees and Susan as parties to the agreement, the co-trustees refused to sign it.[87]

The Vice Chancellor held that the mediation failed to produce an enforceable settlement agreement because it was not signed by all of the beneficiaries or the trustees identified as parties to that agreement. We agree and affirm the Vice Chancellor's holding that the agreement is unenforceable.

### E. Jan C. Otto's claims for unjust enrichment and specific performance were properly rejected.

Jan C. Otto contends that Susan and the Otto Grandchildren agreed to (1) share in the beneficial results brought about by his adoption, (2) pay for any and all expenses that would result from agreeing to the adoption, and (3) provide Jan C. with a comfortable retirement.[88] In a March 2010 trial, the Vice Chancellor held that the unclean hands doctrine barred Jan C. Otto from claiming any economic benefit under the trust. In the second stage of the bifurcated trial, the Vice Chancellor rejected Jan C. Otto's claims for unjust enrichment and specific performance.

A party claiming unjust enrichment must prove "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." [89] In the opinion below, the Vice Chancellor held that Jan C. is not a Gore grandchild for purposes of the Pokeberry Trust. We agree and affirm that holding. Because the Otto Grandchildren received no benefit from the adoption, Jan C. is unable to demonstrate an enrichment and the claim for unjust enrichment fails.

To establish a right to specific performance, the party seeking the remedy must prove, *inter alia,* a valid and enforceable contract between the parties.[90] The elements necessary to prove the existence of an enforceable contract are: (1) the intent of the parties to be bound, (2) sufficiently definite terms, and (3) consideration.[91]

With respect to expense reimbursement, the Vice Chancellor held that an enforceable contract existed, but found also that Jan C. Otto "is not entitled to the repayment of expenses he incurred after he breached that agreement by pursuing the right to retain a personal interest in the income or principal of the Pokeberry Trust." [92] In *Peden v. Gray,* we held that

---

85. JX 269, Pokeberry Trust Resolution of Share Allocation Issue, Sept. 27, 2007.

86. *In re Trust for Grandchildren Wilbert L.,* 2011 WL 3444569, at *29.

87. *Id.*

88. *Id.* at *26.

89. *Metcap Sec. LLC v. Pearl Senior Care, Inc.,* 2009 WL 513756 at *5 (Del.Ch. Feb. 27, 2009) *aff'd,* 977 A.2d 899 (Del.2009).

90. *Szambelak v. Tsipouras,* 2007 WL 4179315, at *4 (Del.Ch. Nov. 19, 2007).

91. *Gallagher v. E.I. DuPont De Nemours & Co.,* 2010 WL 1854131, at *3 (Del.Super. Apr. 30, 2010).

92. *In re Trust for Grandchildren Wilbert L.,* 2011 WL 3444569, at *28.

"specific performance will not be granted to a party who is in default of a material obligation under the contract, unless that party is excused from performance of that obligation."[93] Jan C. has not shown any legal or equitable basis to support his decision to retain all of the income from the Pokeberry Trust for himself. Furthermore, Jan C. has already benefited by having more than $289,000 in legal expenses paid by Susan and his sons before he breached his agreement with them.

■ With respect to Jan C.'s claimed entitlement to share in the beneficial results and to have a comfortable retirement, the Vice Chancellor found no enforceable contract: "Jan C. has not proven the existence of any other agreement under which he would be entitled to additional payments from his former wife and sons."[94] In fact, Jan C. represented to Susan that he did not seek any benefits other than out-of-pocket expenses as a result of his participation. Moreover, he promised to distribute the shares he received to the Otto Grandchildren.[95] To the extent offers were made, these offers were conditioned upon Jan C.'s adoption creating more income for the Otto Grandchildren.[96] That never occurred. Therefore, Jan C.'s claim for specific performance fails.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the Court of Chancery is affirmed.

---

93. *Peden v. Gray,* 886 A.2d 1278 (Del.2005) (TABLE).

94. *In re Trust for Grandchildren Wilbert L.,* 2011 WL 3444569, at *28.

