# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DOMINICK A. PULIERI, as Court Appointed Receiver for SUNVIEW CORPORATION,

Plaintiff,

v.

BOARDWALK PROPERTIES, LLC,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 9886-CB

## MEMORANDUM OPINION

Date Submitted: December 12, 2014
Date Decided: February 18, 2015

Kevin William Gibson of GIBSON & PERKINS P.C., New Castle, Delaware; *Attorney for Plaintiff*.

Gregory P. Williams, Blake Rohrbacher and Susan M. Hannigan of RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendant*.

**BOUCHARD, C.**

## I. INTRODUCTION

This action involves an alleged oral agreement made over twelve years ago concerning the ownership of real property located at 101 South Boardwalk, Rehoboth Beach, Delaware 19971 (the "Rehoboth Property"). The Rehoboth Property used to be a motel called the Sunview Motel. It is now home to a Greene Turtle restaurant.

The thrust of the oral agreement, which is referred to as the "Friendly Agreement," is that Sunview Corporation ("Sunview") would transfer the Rehoboth Property to Boardwalk Properties, LLC ("Boardwalk") and then, upon the satisfaction of two conditions discussed below, Boardwalk would retransfer the Rehoboth Property back to Sunview on a "dollar for dollar basis." Sunview transferred the Rehoboth Property to Boardwalk for $3.2 million in 2002, and dissolved four years later in 2006. In 2013, the principal behind Sunview demanded that Boardwalk retransfer the Rehoboth Property for $3.2 million, which Boardwalk refused to do.

In 2014, a Court-appointed receiver for Sunview filed this action asserting two claims against Boardwalk: specific performance for breach of contract (Count I) and unjust enrichment (Count II). Boardwalk moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) on four separate grounds: (i) laches; (ii) the Statute of Frauds; (iii) the rule against perpetuities; and (iv) the Complaint otherwise fails to state a claim.

In this opinion, I conclude that Sunview has failed to state a claim for specific performance because at least two essential terms of the Friendly Agreement—the conditions to and timing of Boardwalk's obligation to perform—are not sufficiently definite to demonstrate the existence of a valid contract. I also conclude for the reasons

1

explained below that the specific performance claim is legally defective either by application of the rule against perpetuities or the doctrine of laches, depending on whether or not the Friendly Agreement is construed to require Sunview to demand that Boardwalk retransfer the Rehoboth Property before Boardwalk must perform. Finally, I conclude that Sunview's unjust enrichment claim, which is premised on the theory that the Rehoboth Property was transferred to Boardwalk for less than fair value in 2002, must be dismissed on laches grounds. Accordingly, I grant Boardwalk's motion to dismiss the Complaint.

## II. BACKGROUND[1]

### A. The Parties

Plaintiff Dominick A. Pulieri ("Pulieri") is a former director, officer, and stockholder of Sunview Corporation. Pulieri is also a stockholder of non-party Grotto Pizza, Inc. ("Grotto"), a chain of pizzerias well known in Delaware. On June 13, 2014, in a related action in this Court (C.A. No. 9701), the Court appointed Pulieri as the receiver of Sunview Corporation "for the limited purpose of prosecuting an action against Boardwalk Properties, LLC for specific performance of a contract for the transfer of real property located at 101 South Boardwalk, Rehoboth Beach, Delaware 19971."[2] Pulieri is

---

[1] Unless noted otherwise, the facts recited in this opinion are based on the well-pled allegations of the Verified Complaint (the "Complaint"), which are accepted as true for this motion, and the documents attached to it. *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011); Ct. Ch. R. 10(c).

[2] Compl. Ex. B.

the named plaintiff in this action, but I refer to the plaintiff as "Sunview" because that is the entity on whose behalf Pulieri has asserted the claims in this action.

Sunview Corporation was a Delaware corporation with its principal place of business in Rehoboth Beach, Delaware. On March 6, 2006, Pulieri filed a Certificate of Dissolution for Sunview with the Delaware Secretary of State.[3]

Non-party Joseph Paglianite ("Paglianite"), Pulieri's brother-in-law, is also a former director, officer, and stockholder of Sunview.[4]

Defendant Boardwalk Properties, LLC is a Delaware limited liability company. Boardwalk is the current owner of the Rehoboth Property.

Non-party Joseph J. Farnan, Jr. ("Farnan"), a former federal judge, had the authority to act on behalf of Boardwalk and non-party KidFar Properties, LLC ("KidFar") at all relevant times.

### B. The Purported Oral Agreement

From the late 1990s through 2003, Sunview, Grotto, non-party Lido Realty and certain other unspecified Grotto-related entities (collectively, the "Grotto Entities"[5]) were experiencing financial hardship. During that period, Farnan offered financial assistance to certain of the Grotto Entities, including by loaning money to them.

---

[3] *Id.* Ex. A.

[4] There is no allegation in the Complaint that Paglianite is a former Sunview stockholder, but the parties do not dispute this point. *See, e.g.*, Tr. of Oral Arg. 10.

[5] The Complaint defines "Grotto Entities" as "Grotto, Pulieri, Sunview, Lido Realty and other Grotto related entities." Compl. ¶ 12.

"In or around 2002 to 2003,"[6] Farnan and the Grotto Entities allegedly entered into the Friendly Agreement, an oral agreement pursuant to which the Grotto Entities would transfer certain real estate to Farnan-affiliated entities and then, upon the satisfaction of two conditions, the Farnan-affiliated entity would retransfer that real estate back to the respective Grotto Entity on a "dollar for dollar basis." More specifically, as alleged in the Complaint, the Friendly Agreement involved

> a series of real estate transactions by which the respective Grotto Entity-owner would transfer certain real property to entities, for which Farnan was acting as the authorized agent . . . , on the condition that the respective Grotto Entity-owner would retain the right to have the real property re-transferred to it on a dollar for dollar basis, upon the happening of two contingencies[,] the first being the improvement of the financial health of the Grotto Entities and the second contingency being an initiation of a buy-out or removal of the interests of Pulieri's brother-in-law, [Paglianite], from all Grotto Entities with the exception of Pizza Systems, Inc.[7]

I refer to the improvement of the financial health of the Grotto Entities as the "Financial Improvement Condition," to the removal of Paglianite's interests in certain Grotto Entities as the "Paglianite Removal Condition," and to both together as the "Retransfer Conditions."

Regarding the Paglianite Removal Condition, Sunview alleges that "[f]or many years leading up to the Friendly Agreement, Farnan had advised Pulieri to jettison Paglianite, counseling him to 'get rid of his evil brother-in-law.' "[8] According to

---

[6] *Id.* ¶ 17.

[7] *Id.*

[8] *Id.* ¶ 18.

4

Sunview, Farnan sought to remove Paglianite as Pulieri's business partner "so that Farnan, his family, and/or entities controlled by Farnan could take Paglianite's place and thereby exert control and undue influence over Pulieri."[9]

### C.    The Rehoboth Property

The first alleged transfer pursuant to the Friendly Agreement involved the Rehoboth Property, which Sunview owned at the time.

In December 2002, Sunview needed money to make a balloon payment on the loan it had entered into to purchase the Rehoboth Property. Farnan "counseled" Pulieri and Sunview to transfer the Rehoboth Property to Boardwalk in an arrangement to be governed by the Friendly Agreement—*i.e.*, upon satisfaction of the Retransfer Conditions, Boardwalk would transfer the Rehoboth Property back on a dollar-for-dollar basis.[10]

On December 30, 2002, Pulieri and Sunview transferred the Rehoboth Property to Boardwalk for $3.2 million.[11] Farnan allegedly "failed to advise Sunview and Pulieri that the Statute of Frauds required the transfer of real estate to be in writing."[12] Instead, Farnan purportedly advised Pulieri "that a written agreement was not necessary as the

---

[9] *Id.* ¶ 20. The Complaint alleges in considerable detail a close personal and business relationship between Pulieri and Farnan and his family dating back to the early 1990's. *Id.* ¶¶ 11(a)-(r).

[10] *Id.* ¶ 36.

[11] *Id.* Ex. F. The deed is dated December 30, 2002, and was recorded on January 6, 2003.

[12] *Id.* ¶ 37.

5

deal was simply a 'friendly transaction,' part of the Friendly Agreement."[13]   Sunview

also alleges that the $3.2 million transfer price was "substantially below fair market

value," in part because Pulieri and Sunview "did not list the [Rehoboth Property] for sale

on the market nor did Pulieri engage an independent appraisal."[14]

### D. The Dewey Beach Property

The second alleged transfer pursuant to the Friendly Agreement involved real

estate located in Dewey Beach, Delaware (the "Dewey Beach Property").  At the time,

Lido Realty, of which Grotto, Pulieri, and Paglianite were general partners, owned the

Dewey Beach Property.

In early 2003, Pulieri faced an income tax liability of approximately $397,000.  As

before, Farnan "counseled" Pulieri, Lido Realty, and Grotto to transfer the Dewey Beach

Property to KidFar in another arrangement pursuant to the Friendly Agreement—*i.e.*,

upon satisfaction of the Retransfer Conditions, KidFar would transfer the Dewey Beach

Property back on a dollar-for-dollar basis.[15]   Farnan "represented and assured Pulieri that

the transaction was only temporary."[16]

---

[13] *Id.* ¶ 38.

[14] *Id.* ¶¶ 39, 41.

[15] *Id.* ¶ 25.

[16] *Id.* ¶ 26.

6

On May 8, 2003, Lido Realty and Grotto transferred the Dewey Beach Property to KidFar for $2.8 million.[17] Farnan established this $2.8 million transfer price unilaterally, and he again allegedly "failed to advise Pulieri, Lido [Realty] or Grotto that the Statute of Frauds required the transfer of real estate to be in writing."[18]

In the fall of 2004, Pulieri informed Farnan and KidFar that he, Lido Realty, and Grotto were "ready, willing, and able to exercise their right to have the Dewey Beach Property re-transferred on a dollar-for-dollar basis."[19] On January 12, 2006, KidFar transferred the Dewey Beach Property to a new entity, Grotto Pizza Dewey, LLC, a Delaware limited liability company of which Pulieri is the sole member, for $3.1 million.[20] Sunview contends this retransfer price "constitut[ed] the original transfer amount and transactional costs."[21]

---

[17] *Id.* Ex. D. On June 11, 2003, the three Deeds of Transfer for the Dewey Beach Property were recorded.

[18] *Id.* ¶ 28.

[19] *Id.* ¶ 31.

[20] *Id.* Ex. E. On January 13, 2006, this Deed of Transfer for the Dewey Beach Property was recorded.

[21] *Id.* ¶ 32.

7

### E.     Sunview Dissolves

On March 6, 2006, Sunview dissolved.  Pulieri executed the Certificate of Dissolution as Sunview's President.[22]  The Complaint specifically alleges that Sunview, "prior to dissolution, complied with all terms of the Friendly Agreement."[23]

### F.     Pulieri Initiates Litigation against His Former Counsel[24]

On September 6, 2013, Pulieri, Sunview, and other Grotto-related entities filed a complaint in Delaware Superior Court against Pulieri's former counsel, Duane Morris LLP.  As amended, the complaint asserts claims for legal malpractice for failing to timely pursue certain claims against Farnan and others, including claims related to the retransfer of the Rehoboth Property.[25]

---

[22] *Id.* Ex. A.  Sunview's board of directors (Pulieri and Paglianite) authorized the dissolution on December 31, 2005.

[23] *Id.* ¶ 47.

[24] Sunview requests that I take judicial notice of the truth of the allegations of the amended complaint filed in the Delaware Superior Court action, C.A. No. S13C-09-006, (Def.'s Ex. 1) and Pulieri's affidavit submitted in connection with his brief in opposition to the defendant's motion for judgment on the pleadings (Def.'s Ex. 2).  I decline to do so.  Delaware Rule of Evidence 202(d)(1)(B) permits the Court to take judicial notice of "records of the court in which the action is pending and of any other court of this State or federal court sitting in or for this State."  Taking judicial notice of the truth of the statements in the Superior Court filings, however, is beyond the scope of what Rule 202(d)(1)(B) permits. *See In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *8-9 (Del. Ch. Dec. 17, 2013) (construing Rule 202 to permit a Delaware court "to consider filings and other docketed items that led up to the order, ruling, or decision" and not as "a license to credit the contents of filings in other courts").  I draw upon certain allegations from the Superior Court filings for the limited purpose of reciting the relevant background facts, but I do not rely on them in my analysis.

[25] *See* Def.'s Ex. 1 at ¶ 249.

According to that amended complaint, Pulieri and Sunview learned of facts giving rise to their claims related to the Rehoboth Property in June 2009.[26] In May 2010, they retained Duane Morris to pursue those claims against Farnan and Farnan-affiliated entities.[27]

On February 10, 2012, Duane Morris informed Pulieri that bringing a claim against Boardwalk related to the Rehoboth Property could result in sanctions against Duane Morris and Sunview.[28] In October 2012, Duane Morris refused to bring any claims against Boardwalk related to the Rehoboth Property.[29]

### G. Pulieri Seeks to Have the Rehoboth Property Retransferred

On April 3, 2013, Pulieri, on behalf of Sunview, informed Farnan in writing that Sunview was "ready, willing, and able to have the [Rehoboth Property] transferred back to Sunview pursuant to the terms of the Friendly Agreement."[30] Neither Farnan nor Boardwalk responded to Pulieri's April 2013 letter.

On March 11, 2014, Pulieri's counsel, on behalf of Sunview, sent a second letter to Farnan's counsel in which Pulieri sought to exercise his right under the Friendly

---

[26] *Id.* at ¶¶ 216, 220.

[27] *Id.* at ¶ 204; Def.'s Ex. 2 ¶ 19.

[28] Def.'s Ex. 1 at ¶ 210.

[29] *Id.* at ¶ 222.

[30] Compl. ¶ 42, Ex. G. The typed letter attached to the Complaint as Exhibit G is undated.

9

Agreement to have the Rehoboth Property retransferred.[31]  On April 2, 2014, Farnan's counsel informed Pulieri's counsel that Farnan would not comply with this request.[32]

## H.  Procedural History

On June 13, 2014, Pulieri was appointed as the receiver of Sunview in a separate action.[33]  On July 15, 2014, Pulieri filed the Complaint in his capacity as the Court-appointed receiver of Sunview.  On September 19, 2014, Boardwalk moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6).  On December 12, 2014, I heard oral argument on Boardwalk's motion to dismiss.

## III.  ANALYSIS

### A.  Legal Standard

A motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief must be denied unless, accepting as true all well-pled allegations and drawing all reasonable inferences from those allegations in the plaintiff's favor, there is no "reasonably conceivable set of circumstances susceptible of proof" in which the plaintiff could recover.[34]  The failure to plead an element of a claim warrants dismissal under Rule 12(b)(6).[35]

---

[31] *Id.* Ex. H.

[32] *Id.* Ex. I.

[33] Order, *In re Sunview Corp.*, C.A. No. 9701-CB (Del. Ch. June 13, 2014).

[34] *See Cent. Mortg.*, 27 A.3d at 536.

[35] *See Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000).

## B. Count I Fails to State a Claim for Specific Performance

Count I, which is styled as a claim for breach of contract, asserts that Sunview "is entitled to [the] relief of Specific Performance of the Friendly Agreement directing . . . Boardwalk to re-transfer the [Rehoboth Property] to Sunview Corporation."[36] In support of this request, Sunview alleges it has no adequate remedy at law because the Rehoboth Property "is unique and the damages occasioned by the breach of the Friendly Agreement to transfer real property are difficult to ascertain."[37]

Under Delaware law, a party asserting a breach of an oral agreement must prove the existence of an enforceable contract by a preponderance of the evidence.[38] Where a party seeks an award of specific performance, however, the burden of proof is clear and convincing evidence:

> A party must prove by clear and convincing evidence that he or she is entitled to specific performance and that he or she has no adequate legal remedy. A party seeking specific performance must establish that (1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance.[39]

---

[36] Compl. ¶ 58.

[37] *Id.* ¶ 55.

[38] *See Grunstein v. Silva*, 2014 WL 4473641, at *16 (Del. Ch. Sept. 5, 2014), *appeal docketed*, No. 569,2014 (Del. Oct. 3, 2014).

[39] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

The legal standard here is thus whether it is reasonably conceivable that Sunview could establish a right to specific performance by clear and convincing evidence.[40]

"The elements necessary to prove the existence of an enforceable contract are: (1) the intent of the parties to be bound, (2) sufficiently definite terms, and (3) consideration."[41] Delaware courts have long recognized that equity has no role in supplying a contract's essential terms where a party seeks specific performance, "since that would be rather to make than to execute an agreement."[42] Thus, all essential terms of the agreement must be sufficiently definite to establish an enforceable contract.[43] Furthermore, under Delaware law, an award of specific performance to transfer real

---

[40] It is appropriate to consider this heightened evidentiary burden at the motion to dismiss stage. *See, e.g.*, *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009) ("[I]t is reasonably conceivable that BAE could demonstrate the existence of an enforceable agreement on the facts alleged. Therefore, the Court cannot conclude, on the facts presented here, that BAE would fail the higher clear and convincing standard required for specific performance."); *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2008 WL 151855, at *15 (Del. Ch. Jan. 16, 2008) ("[I]t is reasonably conceivable that PharmAthene could show the LATS contains all of the material and essential terms to be incorporated into the final license agreement. For essentially the same reasons, I consider it conceivable that PharmAthene also could establish that proposition by clear and convincing evidence[.]").

[41] *Otto v. Gore*, 45 A.3d 120, 138 (Del. 2012).

[42] *Godwin v. Collins*, 3 Del. Ch. 189, 199 (Del. Ch. 1868), *aff'd*, 9 Del. 28, 56 (Del. 1869); *see also Mehiel v. Solo Cup Co.*, 2005 WL 1252348, at *7 (Del. Ch. May 13, 2005) ("[T]he Court will not decree this relief [(*i.e.*, specific performance)] if the contractual terms are unclear and indefinite—there must be no need for the Court to supply meaning to essential elements of the contract.").

[43] *See, e.g.*, *Osborn*, 991 A.2d at 1158; *Deene v. Peterman*, 2007 WL 2162570, at *5 (Del. Ch. July 12, 2007) ("[T]he court must be certain of the essential elements of the contractual obligation it is asked to enforce.").

property is "an extraordinary remedy"[44] that is "available at the discretion of this [C]ourt."[45]

This Court has found that that the "price, date of settlement, and the property to be sold" are essential terms of an enforceable contract for the sale of real property.[46] In my view, the material conditions to a party's obligation to perform also are essential terms of an enforceable contract. This comports with the general legal principles set forth in *American Jurisprudence*, which other Delaware courts have cited with approval.[47] According to that legal encyclopedia, which I find persuasive here, the essential terms in a contract for the sale of real property include "(1) the names of the buyer and seller; (2) a description of the property; (3) the sales price or the means of determining the price, and *the terms and conditions of the sale*; and (4) the signature of the party to be charged."[48]

Boardwalk contends that the Complaint fails to allege with sufficient detail several essential terms of the Friendly Agreement, including the date of formation, the parties to

---

[44] *Osborn*, 991 A.2d at 1158.

[45] *Gildor v. Optical Solutions, Inc.*, 2006 WL 4782348, at *11 (Del. Ch. June 5, 2006) (citing *Esso Standard Oil Co. v. Cunningham*, 114 A.2d 380, 383 (Del. Ch. 1955), *aff'd*, 118 A.2d 611 (Del. 1955)).

[46] *See River Enters., LLC v. Tamari Props., LLC*, 2005 WL 356823, at *2 (Del. Ch. Feb. 15, 2005); *see also Walton v. Beale*, 2006 WL 265489, at *5 (Del. Ch. Jan. 30, 2006), *aff'd*, 913 A.2d 569 (Del. 2006) (TABLE).

[47] *See, e.g.*, *Heckman v. Nero*, 1999 WL 182570, at *4 (Del. Ch. Mar. 26, 1999) ("Even if aspects of the agreement are obscure, the agreement will be enforceable if the Court is able to ascertain the terms and conditions on which the parties intend to bind themselves." (citing 77 Am. Jur. 2d *Vendor and Purchaser* § 7)).

[48] 77 Am. Jur. 2d *Vendor and Purchaser* § 4 (emphasis added).

the agreement, the covered properties, and the retransfer price.[49] In my opinion, at least two essential terms of the Friendly Agreement are not sufficiently definite to state a claim for specific performance as alleged in the Complaint: (1) the Retransfer Conditions to Boardwalk's obligation to retransfer the Rehoboth Property to Sunview, and (2) the timing of Boardwalk's obligation to perform under the Friendly Agreement.

The two Retransfer Conditions indisputably are essential terms of the Friendly Agreement because they are the necessary conditions that Sunview must satisfy before the Rehoboth Property could be retransferred.[50] But these essential terms are not sufficiently definite in my view for two reasons.

First, both the Financial Improvement Condition and the Paglianite Removal Condition are dependent on a change in circumstances affecting the "Grotto Entities," *i.e.*, "the improvement of the financial health of the Grotto Entities" and the "removal of the interests of" Paglianite "from all Grotto Entities with the exception of Pizza Systems, Inc."[51] The Complaint, however, expressly defines "Grotto Entities" to include "other Grotto related entities" that are not specified in the Complaint.[52] The fact that these additional entities are not specified anywhere in the Complaint means that one cannot know which entities must have improved financially to satisfy the Financial Improvement

---

[49] Def.'s Reply Br. 24-26; Def.'s Op. Br. 25-28.

[50] *See* 77 Am. Jur. 2d *Vendor and Purchaser* § 4.

[51] Compl. ¶ 17.

[52] *Id.* ¶ 12.

14

Condition or from which entities Paglianite's interests must have been removed to satisfy the Paglianite Removal Condition.

Second, the Financial Improvement Condition refers vaguely to the "improvement of the financial health" of the Grotto Entities. In my view, the Complaints fails to identify any sufficiently definite metric for any party to the Friendly Agreement, let alone the Court, to discern what it means for the financial health of the Grotto Entities (assuming one could determine which entities this term encompasses in the first place) to have improved in order to conclude that this condition has been satisfied.

Even if the Retransfer Conditions were sufficiently definite, a related yet distinct essential term is not sufficiently definite: the timing of Boardwalk's obligation to perform. This is an essential term to the Friendly Agreement because it dictates when Boardwalk must retransfer the Rehoboth Property to Sunview.[53] The Complaint alleges that the Farnan-affiliated entities' obligation to perform under the Friendly Agreement arises "upon the happening" of the Retransfer Conditions.[54] This term is not sufficiently definite because the Complaint does not specify what "upon the happening" means as a general matter or with respect to the Rehoboth Property.

For example, "upon the happening" could mean that Boardwalk was required to perform automatically upon the satisfaction of the Retransfer Conditions or it could

---

[53] *See* 77 Am. Jur. 2d *Vendor and Purchaser* § 4.

[54] Compl. ¶ 17.

15

mean, as Sunview contends in its opposition brief,[55] that Boardwalk was required to perform only if Sunview first makes a demand that it do so. Thus, in my view, even when viewing the well-pled allegations and all reasonable inferences from those allegations most favorably to Sunview, the timing of Boardwalk's obligation to retransfer the Rehoboth Property is not sufficiently definite to establish that the Friendly Agreement is an enforceable contract.[56]

* * *

For the foregoing reasons, it is not reasonably conceivable in my opinion that Sunview could prove by a preponderance of the evidence the existence of an enforceable contract because, as alleged, essential terms of the Friendly Agreement are not

[55] *See* Pl.s' Ans. Br. 10-12, 17, 37. Sunview concedes no such requirement is pled in the Complaint. Tr. of Oral Arg. 44. It is procedurally improper for Sunview to attempt to rewrite its Complaint in its brief. *See MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *5 (Del. Ch. May 5, 2010) ("[The plaintiff] cannot supplement the complaint through its brief."). Still, its attempt to do so reinforces my conclusion that Sunview does not know the essential terms of the contract for which it is now seeking specific performance.

[56] I also have doubts as to whether the price of the retransfer is sufficiently definite. Sunview alleges that the Friendly Agreement provides for the retransfer of properties from the Farnan-affiliated entities back to the Grotto Entities to be on a "dollar for dollar basis" and Sunview seeks in Count I to have the Rehoboth Property retransferred to it for $3.2 million, which is "the same amount, dollar for dollar, for which Boardwalk received the property." Compl. ¶¶ 17, 49. But, the Complaint alleges that the Dewey Beach Property, which Sunview contends is evidence that the Friendly Agreement is binding and enforceable, was transferred to KidFar (a Farnan-affiliated entity) for $2.8 million in May 2003, and retransferred to Grotto Pizza Dewey, LLC for $3.1 million in January 2006. *Id.* ¶¶ 25, 32. According to the Complaint, the $300,000 increase accounted for the "transactional costs." *Id.* ¶ 32. The increase in the retransfer price for the Dewey Beach Property to account for "transaction costs" suggests that the economic terms of the Friendly Agreement were not sufficiently definite but instead contemplate further negotiations.

16

sufficiently definite.[57] Thus, *a fortiori*, I conclude that it is not reasonably conceivable that Sunview could prove, by clear and convincing evidence, its claim for specific performance of the Friendly Agreement with respect to the Rehoboth Property.[58]

## C.  Count I also is Barred by the Rule Against Perpetuities or Laches

Boardwalk alternatively asserts that Sunview's claim for specific performance must be dismissed under the rule against perpetuities or under laches, depending on whether Boardwalk's obligations under the Friendly Agreement were contingent on Sunview demanding that Boardwalk perform under the agreement. Specifically, assuming a demand of performance was required, Boardwalk argues that the Friendly Agreement is void under the rule against perpetuities because Sunview could exercise its option to repurchase the Rehoboth Property beyond the perpetuities period.[59] Conversely, assuming a demand of performance was not required, Boardwalk argues that Count I is barred by laches because Sunview knew of Boardwalk's failure to perform

---

[57] *See Black Horse Capital, LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at \*20 (Del. Ch. Sept. 30, 2014) ("Because the essential terms of the Serenity Agreement have not been alleged with sufficient definiteness to render that agreement enforceable, it is not reasonably conceivable that the remedy of specific performance will be available in this case.").

[58] Given that the Complaint fails to demonstrate the existence of a valid contract, I do not consider the sufficiency of the allegations of the Complaint concerning the other requirements for specific performance, *i.e.*, whether Sunview is ready, willing, and able to perform and whether the balance of equities tips in its favor.

[59] Def.'s Reply Br. 13-18.

more than eight years before it filed suit and unreasonably delayed in seeking an award of specific performance.[60]

For the reasons discussed below, I conclude that Count I must be dismissed in either scenario because the Friendly Agreement would violate the rule against perpetuities if it did include such a requirement or, alternatively, would be barred under the doctrine of laches if it did not.

### 1. Rule Against Perpetuities

As the Delaware Supreme Court noted in *Stuart Kingston, Inc. v. Robinson*,[61] the common law rule against perpetuities provides that "[n]o interest [in real property] is good unless it vests, if at all, not later than twenty-one years after some life in being at the creation of the interest."[62] Although courts have shown a willingness to deviate from the traditional perpetuities period in contracts governing commercial transactions,[63] Delaware law nonetheless provides that "an indefinite time limitation to exercise a right

---

[60] *Id.* 8-9; Def.'s Op. Br. 13-16.

[61] 596 A.2d 1378 (Del. 1991).

[62] *Id.* at 1383 ("The rule against perpetuities has long been accepted as part of the common law of Delaware as a principle grounded in the public policy against restricting the alienability of land and interests in land.").

[63] *See, e.g.*, *Pathmark Stores, Inc. v. 3821 Assocs., L.P.*, 663 A.2d 1189, 1193 (Del. Ch. 1995) ("Commercial transactions . . . have absolutely no tie to either lives in being or twenty-one years."); *see also JD Hldgs., L.L.C. v. Dowdy*, 2014 WL 4980669, at *12 (Del. Ch. Oct. 1, 2014) ("[I]n a commercial transaction, a right will not violate the rule against perpetuities if it will be exercised or lapse within a reasonable time.").

18

to a future interest, even in a commercial agreement, violates the Rule."[64] "If there is any possibility that the interest will vest beyond the period of the rule, then it is void *ab initio*."[65]

Sunview contends it possesses a "power of termination" or a "right of reentry" to the Rehoboth Property that is not subject to the rule against perpetuities,[66] citing *Welsh v. Heritage Homes of DeLaWarr, Inc.*[67] as its sole supporting authority. Sunview's reliance on *Welsh* is misplaced. Under Delaware law, where, as here, a contract for the sale of real property provides that a grantor may regain title to the property *by paying consideration*, the grantor possesses an option to repurchase the property, not a power of termination or right of reentry that is created by a transfer of a fee simple subject to a condition subsequent.[68] The Court's interpretation of the contract at issue in *Welsh* illustrates this precise point. There, the contract provided:

> Buyer agrees that in the event Buyer is unable to commence construction for any reason not attributed to Seller, Buyer agrees to-reconvey the subject lot at the same price as sold to Buyer, within 30 days of receipt of Seller's request to re-convey.[69]

---

[64] *Cornell Glasgow, LLC v. LaGrange Props., LLC*, 2012 WL 3157124, at *3 (Del. Super. Aug. 1, 2012) (Slights, J.) (citing *Stuart Kingston*, 596 A.2d at 1384).

[65] *Stuart Kingston*, 596 A.2d at 1383 (citing *Taylor v. Crosson*, 98 A. 375, 377 (Del. Ch. 1916)).

[66] Pl.'s Ans. Br. 28-30.

[67] 2008 WL 442549 (Del. Ch. Feb. 15, 2008, revised Feb. 19, 2008).

[68] *Id.* at *7.

[69] *Id.* at *4.

Applying principles from the Restatement (First) of Property, which the Delaware Supreme Court had cited with approval,[70] the Court in *Welsh* concluded that the contract did not create a power of termination or right of reentry because the seller needed "to pay *consideration* (the original purchase price) to the [buyer] in order to reclaim title."[71] Further, the Court concluded that the language of the provision quoted above was "a textbook example of an option in real property" because it could only be construed to mean that the buyer "*may* repurchase the Property for a fixed price upon the occurrence of [a condition], *but in no event is it required to do so*."[72]

I find no meaningful distinction between the provision at issue in *Welsh* and the Friendly Agreement. Here, assuming Sunview is required to demand performance, as it contends in its brief, the alleged terms of the Friendly Agreement *do not require* Sunview to do so. In other words, upon satisfaction of the Retransfer Conditions, Sunview has the right, *but not the obligation*, to demand performance and thereby repurchase the Rehoboth Property for the retransfer price. As in *Welsh*, I conclude that the consideration that Sunview must pay to regain title to the Rehoboth Property means that the Friendly Agreement did not grant to Sunview a power of termination or a right of reentry. Even if,

---

[70] *See, e.g.*, *Libeau v. Fox*, 892 A.2d 1068, 1072 (Del. 2006) ("The trial court then applied settled law, as articulated in . . . the *Restatement (First) of Property* § 406 (1944) . . . . We affirm that holding on the basis of and for the reasons stated in the Court of Chancery's opinion.").

[71] *See Welsh*, 2008 WL 442549, at *7 (citing Restatement (First) of Prop. § 394 cmt. c (1944)).

[72] *Id.* (emphasis added).

as Sunview argues, "[i]t is evident from the facts surrounding the transaction that Sunview never intended to part permanently with the [Rehoboth Property],"[73] the long-standing legal principles outlined in *Welsh* teach that the nature of a property interest depends on the terms of the grant, not the subjective intent of the grantor.[74] The parties could have structured this transaction differently to provide Sunview with a power of termination or a right of reentry, but they did not. The way they structured the Friendly Agreement was for Sunview to transfer the Rehoboth Property to Boardwalk in fee simple and to receive an option to repurchase it.[75]

Because it is "regarded as having the effect of creating a future interest," an option to purchase real property, such as Sunview's option to repurchase the Rehoboth Property,

---

[73] Pl.'s Ans. Br. 29.

[74] *See, e.g.*, *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."); *Monigle v. Darlington*, 81 A.2d 129, 131 (Del. Ch. 1951) ("The meaning of restrictive words is governed by the intention of the grantor to be ascertained from the words themselves, or from the particular words considered in the light of other words or provisions in the deed.").

[75] Sunview also argues that *Welsh* is distinguishable on equitable grounds because, unlike the real estate developer in *Welsh* that "presum[ably] . . . had the assistance of legal counsel in drafting the contract," Pulieri "relied on the advice and representations of his close friend, Farnan, who assured [him] that the [Rehoboth Property] would be returned when [Pulieri] could afford to once again possess it." *Id.* 29-30. In my view, the Court's analysis in *Welsh* cannot reasonably be read to turn on this point. Sunview, moreover, has not offered any authority to support applying estoppel or similar equitable principles in a rule against perpetuities analysis, and I decline to do so here.

21

is subject to the rule against perpetuities.[76] " 'If it is possible that the option might not be exercised within the limits of the time allowed by the Rule Against Perpetuities, the option is void.' "[77]

Boardwalk contends that Sunview's option is void under the rule against perpetuities because Sunview, an entity with perpetual existence, could have exercised that option to repurchase the Rehoboth Property from Boardwalk, another entity with perpetual existence, at an indefinite time in the future.[78] I agree because I do not see how the Financial Improvement Condition must be satisfied within a defined period of time. There is no reasonable limitation of any kind on when Sunview must satisfy that condition or, after satisfying both Retransfer Conditions, exercise its option.

By way of example, Sunview might not satisfy the Financial Improvement Condition (or thereafter exercise its option) until two days from now or two centuries from now. The latter example may seem extreme, but it conclusively demonstrates that the duration of Sunview's option is indefinite. Accordingly, if the Friendly Agreement required Sunview to demand Boardwalk's performance, as Sunview contends, then Count I must be dismissed under Court of Chancery Rule 12(b)(6) because Sunview's option to repurchase the Rehoboth Property would be void under the rule against perpetuities.

---

[76] *See Emerson v. Campbell*, 84 A.2d 148, 153 (Del. Ch. 1951).

[77] *Heritage Homes of De La Warr, Inc. v. Alexander*, 2005 WL 2173992, at *2 (Del. Ch. Sept. 1, 2005) (quoting *Emerson*, 84 A.2d at 153), *aff'd*, 900 A.2d 100 (Del. 2006) (TABLE).

[78] Def.'s Reply Br. 16-18.

22

### 2. Laches

The Delaware Supreme Court has defined laches generally as "an unreasonable delay by the plaintiff in bringing suit after the plaintiff learned of an infringement of his rights, thereby resulting in material prejudice to the defendant."[79] Denying relief on the grounds of laches typically requires the defendant to show three elements: "first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, prejudice to the defendant."[80]

Although this Court's laches inquiry is fact-specific,[81] it is often guided (but not necessarily dictated) by the analogous statute of limitations.[82] As Chief Justice, then-Chancellor, Strine noted in *In re Sirius XM Shareholder Litigation*,[83] "laches may bar a plaintiff in equity before the analogous statute of limitations has run, but a filing after the analogous statute of limitations has run cannot be justified except in the 'rare' and 'unusual' circumstance that a recognized tolling doctrine excuses the late filing."[84] This

---

[79] *Reid v. Spazio*, 970 A.2d 176, 182 (Del. 2009).

[80] *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005).

[81] *See id.* ("Whether or not these three elements [to demonstrate laches] exist is generally determined by a fact-based inquiry.").

[82] *See Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013) ("In determining whether an action is barred by laches, the Court of Chancery will normally, but not invariably, apply the period of limitations by analogy as a measure of the period of time in which it is reasonable to file suit.").

[83] 2013 WL 5411268 (Del. Ch. Sept. 27, 2013).

[84] *Id.* at *4 (citations omitted); *see also U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996) ("Absent some unusual circumstances, a

is because, as the Chief Justice continued, "[a]fter the statute of limitations has run, defendants are entitled to repose and are exposed to prejudice as a matter of law by a suit by a late-filing plaintiff who had a fair opportunity to file within the limitations period."[85]

The three-year statute of limitations for contract claims starts to run when the claim accrues,[86] and a breach of contract claim accrues "at the time of breach,"[87] "even if the plaintiff is ignorant of the cause of action."[88] A party asserting a claim for specific performance in this Court, however, will typically need to act with even greater alacrity than simply within the analogous limitations period. Chief Justice Strine summarized this principle in *CertainTeed Corp. v. Celotex Corp.*:[89]

> A claim for specific performance is a specialized request for a mandatory injunction, requiring a party to perform its contractual duties. Like any request for an injunction, such a claim necessarily invokes a stricter requirement for prompt action by the plaintiff, and a plaintiff may not wait the full period of three years set forth in [10 *Del. C.*] § 8106 to seek such relief. Laches, rather, will arise much earlier, if a plaintiff sits on its claim and does not demand prompt action.[90]

---

court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").

[85] *Sirius XM*, 2013 WL 5411268, at *4.

[86] 10 *Del. C.* § 8106(a).

[87] *Whittington v. Dragon Gp. L.L.C.*, 2008 WL 4419075, at *5 (Del. Ch. June 6, 2005, revised Sept. 30, 2008).

[88] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).

[89] 2005 WL 217032 (Del. Ch. Jan. 24, 2005).

[90] *Id.* at *6; *see also State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 527 (Del. Ch. 2005) ("Remedies of this kind will only issue if the plaintiff acts with dispatch, and are

24

Here, Boardwalk describes Count I as "between four and ten years old."[91]  More specifically, Boardwalk contends that Sunview's claim for specific performance accrued: (a) in fall 2004, when Pulieri was "ready, willing, and able" to repurchase the Dewey Beach Property;[92] (b) in March 2006, when Sunview, "prior to dissolution, complied with all terms of the Friendly Agreement";[93] (c) in June 2009, when, as alleged in the Superior Court action, Sunview first learned of the claim;[94] or (d) in May 2010, when, as Pulieri swore in an affidavit submitted to the Superior Court, Sunview retained counsel to bring a claim regarding the Rehoboth Property against Farnan and Farnan-affiliated entities.[95] In opposition, Sunview argues that its specific performance claim "accrued, at the earliest, in the spring of 2013 when Pulieri first demanded the return [of] the [Rehoboth Property]" and Boardwalk refused to perform.[96]

For purposes of Boardwalk's motion to dismiss, I need not resolve precisely when Sunview's contract claim accrued.  In my opinion, Sunview's claim—assuming the Friendly Agreement did not require Sunview to demand performance—accrued no later

---

normally foreclosed to a plaintiff who sits on its hands until near the end of the analogous limitations period.").

[91] Def.'s Op. Br. 16.

[92] Compl. ¶ 31.

[93] *Id.* ¶ 47.

[94] Def.'s Ex. 1 ¶ 220.

[95] Def.'s Ex. 2 ¶ 19.

[96] Pl.'s Ans. Br. 10.

than March 6, 2006, the date of Sunview's dissolution. The fact that Boardwalk failed to perform after Sunview—by its own admission—had satisfied the Retransfer Conditions and complied with the other terms of the Friendly Agreement before it dissolved[97] necessarily means, in my view, that Sunview had knowledge of its claim against Boardwalk for breaching the Friendly Agreement no later than its dissolution in 2006.

Accordingly, Count I would have been presumptively untimely had it been filed after March 6, 2009, three years after the date of Sunview's dissolution, let alone in July 2014. Notably, Sunview does not argue that a recognized tolling doctrine applies,[98] nor does it offer any "unusual conditions or extraordinary circumstances" that, under *IAC/InterActiveCorp v. O'Brien*,[99] may justify deviating from the three-year limitations period. From my independent analysis, none of the *IAC* factors (or equivalent circumstances) is implicated here. In light of Sunview's unexcused delay, I conclude that Count I must be dismissed on laches grounds assuming that the Friendly Agreement did not contain a demand requirement. For the reasons articulated by Chief Justice Strine in *CertainTeed*, moreover, laches likely would have barred Count I even before the

---

[97] Compl. ¶ 47 ("Plaintiff Sunview, prior to dissolution, complied with all terms of the Friendly Agreement.").

[98] *See Pettinaro*, 870 A.2d at 525 ("A plaintiff asserting a tolling exception must plead facts supporting the applicability of that exception."); *see also Krahmer v. Christie's Inc.*, 903 A.2d 773, 778 (Del. Ch. 2006) ("[T]olling exceptions include the doctrines of (1) fraudulent concealment, (2) inherent[ly] unknowable injury, and (3) equitable tolling.").

[99] 26 A.3d 174, 178 (Del. 2011) (providing an illustrative, non-exhaustive list of factors that could bear on this Court's inquiry of when the analogous statute of limitations should not apply).

expiration of the analogous limitations period because Sunview failed to act with the alacrity necessary to assert a claim seeking specific performance.

Sunview attempts to salvage the timeliness of its claim by arguing that any delay was the result of the "prolonged investigation and delay" of Pulieri's lawyers at Duane Morris. But, as recently as *Levey v. Brownstone Asset Management, LP*,[100] the Delaware Supreme Court rejected this line of argument, concluding that the torpor of counsel "cannot excuse" a plaintiff's otherwise unreasonable delay because, under Delaware law, a party " 'must be deemed bound by the acts of his lawyer-agent.' "[101] Thus, even if "[t]he Superior Court complaint makes it abundantly clear that Pulieri made good faith efforts to bring his and Sunview's claims in a timely fashion,"[102] Pulieri bears responsibility for his lawyers' actions, including their delay.

Finally, Sunview submits that Count I is analogous to the claim for specific performance of an oral agreement found timely in *Walton v. Beale*.[103] I disagree. In *Walton*, a series of delays extended the settlement date for an agreement to sell real property that, under a draft (and unsigned) agreement of sale, the parties initially contemplated would occur in November 1999. During those delays, according to the Court's post-trial findings of fact, "[n]one of the communications between the parties . . .

---

[100] 76 A.3d 764 (Del. 2013).

[101] *Id.* at 769 (quoting *Vance v. Irwin*, 619 A.2d 1163, 1165 (Del. 1993)).

[102] Pl.'s Ans. Br. 12.

[103] 2006 WL 265489 (Del. Ch. Jan. 30, 2006), *aff'd*, 913 A.2d 569 (Del. 2006) (TABLE).

27

reasonably would have led [the buyer] to believe that the [sellers] would not sell him the property."[104] It was only in January 2002, when the sellers expressly informed the buyer that they were revoking their offer to sell, that the buyer learned of the potential breach of their agreement. Shortly thereafter, in July 2002, the seller filed suit seeking specific performance. The Court concluded that the buyer's claim was not barred by laches because he did not have knowledge of the claim until January 2002 and because his July 2002 lawsuit was not an unreasonable delay.[105]

Sunview's allegations stand in stark contrast to the facts of *Walton*, where the buyer had no reason to know of the sellers' breach until they expressly revoked their offer. Here, assuming the Friendly Agreement required Boardwalk to retransfer the Rehoboth Property automatically upon Sunview's satisfaction of the Retransfer Conditions and did not require Sunview to demand performance, Sunview had knowledge of its claim by March 6, 2006, the date it dissolved. That is because Sunview admits it had complied with all of the terms of the Friendly Agreement by that date and Sunview inarguably must have known by that date that Boardwalk had not performed. Unlike the reasonable delay of six months between notice of the claim and the lawsuit in *Walton*, I conclude that Sunview's delay of more than eight years from March 2006 until the filing of the Complaint in this action in July 2014 was unreasonable and unjustified.

---

[104] *Id.* at *8 ("[E]ven when things became heated between the parties, the [sellers] never told [the buyer] the deal was off.").

[105] *Id.*

28

Sunview was on notice of its claim for specific performance in March 2006, and it failed to act with the requisite alacrity to vindicate its rights. Thus, assuming the Friendly Agreement did not require Sunview to demand performance by Boardwalk, Count I must dismissed under Court of Chancery Rule 12(b)(6) on the grounds of laches.[106]

### D.     Count II is Barred by Laches

In Count II, an alternative claim for relief, Sunview alleges that Boardwalk is liable for unjust enrichment because it was unfairly "enriched by the transfer of the [Rehoboth Property] in a transaction that was not arms-length in which Boardwalk unilaterally set the terms without consideration of the [Rehoboth Property's] fair market value."[107] Sunview was proportionally impoverished "by the transfer of the [Rehoboth Property] for an amount less than the property's fair market value."[108] Boardwalk, in opposition, argues that Count II must be dismissed as untimely under laches.[109] I agree.

"The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[110] The

---

[106] In light of the above holdings, I do not reach Boardwalk's Statute of Frauds argument.

[107] Compl. ¶ 60.

[108] *Id.* ¶ 61.

[109] Def.'s Reply Br. 28; Def.'s Op. Br. 30-31.

[110] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

analogous statute of limitations for a claim of unjust enrichment is three years,[111] and an unjust enrichment claim accrues when the wrongful act causing the enrichment and impoverishment occurred.[112]

According to the Complaint, the alleged enrichment and impoverishment occurred on December 30, 2002, when Sunview transferred the Rehoboth Property to Boardwalk for the below-market-value price of $3.2 million.[113] Thus, Count II, which was first asserted in July 2014, more than eleven years after it accrued, is presumptively untimely and subject to dismissal on laches grounds absent unusual or extraordinary circumstances that warrant deviating from the analogous limitations period.[114]

Sunview contends that the laches period should be tolled under the inherently unknowable injury doctrine because "Pulieri and Sunview could not know that

---

[111] 10 *Del. C.* § 8106(a).

[112] *See Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 42-43 (Del. Ch. 2012).

[113] Compl. ¶¶ 36, 60-62, Ex. F. Sunview contends that "[t]he Complaint does not support the inference that the unjust enrichment occurred at the time of transfer" in December 2002. It argues instead that the enrichment occurred in 2013 when Boardwalk refused to retransfer the Rehoboth Property after Sunview demanded performance. Pl.'s Ans. Br. 36-37. I disagree for two reasons. First, the only enrichment alleged is Sunview's transfer of the Rehoboth Property to Boardwalk in 2002. Compl. ¶ 60. Second, in my view, the only basis for looking to Boardwalk's retention of the Rehoboth Property in 2013 as the time when Sunview's unjust enrichment claim accrued would be if the Friendly Agreement was an enforceable contract that included a demand requirement. But, if that were the case, Count II would fail to state a claim because "[a] claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim." *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).

[114] *See Sirius XM*, 2013 WL 5411268, at *4.

Boardwalk had been unjustly enriched until their demand for performance was first met with silence in the spring of 2013."[115] The inherently unknowable injury tolling doctrine provides that

> the statute will not run where it would be practically impossible for a plaintiff to discover the existence of a cause of action. No objective or observable factors may exist that might have put the plaintiff[] on notice of an injury, and the plaintiff[] bear[s] the burden to show that [it was] "blamelessly ignorant" of both the wrongful act and the resulting harm.[116]

In my view, Sunview's argument about tolling is based on a mistaken premise.

As explained above, the unlawful conduct that forms the basis for the unjust enrichment claim occurred at the time of Sunview's below-market-value transfer of the Rehoboth Property to Boardwalk in December 2002.[117] Given the nature of the alleged enrichment, Sunview cannot, in my view, legitimately contend that it was impossible to discover the facts giving rise to its claim because the price of the December 2002 transfer was self-evident. Indeed, Sunview expressly admits in its Complaint that it was "willing to sell the [Rehoboth Property] [at] below market value" to Boardwalk in 2002.[118] I also do not see how Sunview could claim to be blamelessly ignorant that Boardwalk had obtained the Rehoboth Property at a below-market-value price when, in addition to their conceded willingness to sell at that price, the Complaint expressly acknowledges that

---

[115] Pl.'s Ans. Br. 37.

[116] *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584-85 (Del. Ch. 2007); *see also Morton v. Sky Nails*, 884 A.2d 480, 482 (Del. 2005).

[117] Compl. ¶¶ 60-62.

[118] *Id.* ¶ 41 (emphasis added).

31

"Pulieri and Sunview did not list the [Rehoboth Property] for sale on the market nor did Pulieri engage an independent appraisal."[119]   The inherently unknowable injury tolling doctrine is thus inapplicable.

Because Sunview has not offered a persuasive justification to depart from the analogous limitations period, I conclude that Count II, a presumptively untimely claim, must be dismissed on laches grounds.

## IV.   CONCLUSION

For the foregoing reasons, Boardwalk's motion to dismiss the Complaint under Court of Chancery Rule 12(b)(6) is GRANTED.  Under Court of Chancery Rule 15(aaa), the dismissal is WITH PREJUDICE.

**IT IS SO ORDERED**.

---

[119] *Id.* ¶ 39.