# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SCOTT BURD, | ) | |
| | ) | |
| Petitioner/Counterclaim Respondent, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-1172-LM |
| | ) | |
| TRACY BURD ELLIMAN, an individual and as Trustee, Executrix, Beneficiary, and DOES 1 through 50, inclusive, | ) | |
| | ) | |
| Respondent/Counterclaim Petitioner. | ) | |

Final Report: June 5, 2025
Date Submitted: February 5, 2025

## POST-TRIAL FINAL REPORT

Scott Burd, Dunwoody, GA; *Pro Se Petitioner*.

Thomas A. Uebler, Terisa A. Shoremount, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, DE; *Attorneys for Respondent Tracy Burd Elliman*.

**MITCHELL, M.**

Scott Burd[1], who is estranged from his father and stepmother, Richard and Barbara Burd, filed this Petition to invalidate their wills and trusts based on undue influence, lack of capacity, and seeks damages for elder abuse. Although we normally see these types of cases after the testators have passed away, here, Richard and Barbara Burd are still alive and defending their ability to change their estate plan. They counterclaimed seeking to declare that their trust and wills are all valid.

In any event, Scott questions whether his father and stepmother had the capacity to make changes to their estate plan, which resulted in him being disinherited. Importantly, he believes his half-sister, Tracy Burd Elliman, unduly influenced her parents to disinherit him and engaged in financial elder abuse. For the reasons explained herein, I find Scott does not meet his burden to prove that the wills and trusts should be set aside by this Court. This is my post-trial final report.

---

[1] This decision refers to the members of the Burd family by their first name to distinguish them. The court intends no disrespect or familiarity.

## I. BACKGROUND[2]

### A. Burd Family Background

Richard Burd and his first wife, Rhoda Ghievil, had two children, Scott Burd and Melanie Burd.[3] Richard and Rhoda divorced, and later Richard married his current wife of 55 years, Barbara Burd.[4] Richard and Barbara had one daughter, Tracy Burd Elliman, the Respondent here.[5] Both Rhoda and Melanie predecease this action.[6] Tracy is married and has two children.[7] Melanie and Scott have no children.[8]

Scott currently lives in Florida, and over the last 25 years has, for varying periods of time, lived in Georgia, Philadelphia, Australia, and Saudi Arabia.[9] Scott's relationship with his family can best be described as sporadic, having gone without, or with very little, contact with them for 10 to 20 years at a time.[10] Despite the ever

---

[2] The facts in this report reflect my findings based on the record developed at trial on January 22, 2025. Citations to the trial transcript are in the form "Tr. __". The Respondent's submitted exhibits 1–69 are cited as "RX__." The lodged depositions are cited as "[First Initial., Last name] Dep." Like the transcript citations. I grant the evidence the weight and credibility I find it deserves.

[3] Tr. 136:15–23.

[4] Tr. 136:12–14.

[5] Tr. 225:19–20.

[6] S., Burd Dep. 36:23–24; Tr. 95:19; Tr. 211:21–23.

[7] Tr. 211:4–16.

[8] Tr. 226:21–227:4.

[9] Tr. 101:12–20.

[10] Tr. 113:18–114:8; Tr. 13:21–23; Tr. 141:19–142:1.

present strife between the two, Richard provided financially for Scott when he needed it.[11] Richard paid Scott's tuition at Emory College.[12] In addition, in 2004, when Scott was forced to leave Australia after being deported when his Australian visa expired, Richard provided Scott with $5,000 for him to come home and allowed Scott to stay with him and Barbara for three weeks in their Delaware home.[13] Richard also lent Scott money to help him purchase a home.[14]

Despite these prior actions, Richard and Scott both testified at trial that they currently have no relationship with one another.[15] Richard described Scott as "a user and abuser of people," and stated that he did not trust him.[16] Barbara, between the years of 2004 and the start of this litigation, has had only two direct instances of contact with Scott. The first being an email she sent him in 2010, and the second being a birthday card she sent when Scott turned 50, but it was sent back to Barbara after being labelled return to sender because Scott no longer lived at the address.[17]

---

[11] Tr. 147:17–19.

[12] Tr. 147:21–148:7.

[13] Tr. 45:8–9; Tr. 140:20–24; Tr. 148:8–10.

[14] Tr. 148:11–14.

[15] Tr. 101:1–3; Tr. 140:10–15.

[16] Tr. 140:10–15; Tr. 142:10–11.

[17] RX 19; Tr. 215:9–17.

Scott claims to have been cut out of the family by Tracy, however Tracy testified that she made attempts over the years to reach out to Scott with no answer, pointing out that her and her parents contact information had not changed.[18]

Prior to her death, Melanie was in regular contact with her father and Barbara through phone calls, and they remained close despite her living in New Mexico, until her death.[19] Richard, Barbara, and Tracy visited Melanie a few times while she was living in New Mexico.[20] Melanie struggled financially so Richard and Barbara set up an annuity account that would produce $300 a month for Melanie, and they also helped her buy her house.[21] Melanie and Scott would communicate occasionally over the phone, and Melanie was the one who informed Scott of their mother, Rhoda's, declining health prompting Scott to briefly move in with Rhoda, in Atlanta, Georgia, before eventually moving away to the Middle East.[22] Melanie called Scott while he was living in the Middle East to tell him that their mother had died.[23]

---

[18] Tr. 249:21–251:3.

[19] Tr. 211:21–212:7.

[20] Tr. 139: 2–7; Tr. 212:8–15.

[21] Tr. 139:8–17; Tr. 154: 5–11; Tr. 212:16–213:6.

[22] S., Burd Dep. 45:23–47:5; 49:7–10.

[23] S., Burd Dep. 47:5–8.

## B.  Sexual Abuse Allegations[24]

Sometime in late 2008 or early 2009, Tracy was contacted by William Allred, Melanie's husband, who told Tracy that Melanie had been sexually abused by Richard when she was a child.[25] Shocked by this information, Tracy contacted Melanie and Scott individually to ask about the accusations.[26] Tracy testified at trial that she spoke with Melanie about the allegations, who said that the memory of the sexual abuse from Richard was one that her husband had convinced her of.[27] When Tracy asked Melanie about Scott's experience, Melanie did not answer, stating that she could not speak to Scott's experience.[28]

When Tracy confronted Scott with the information over the phone a few months later, Scott informed Tracy that both he and Melanie were sexually abused by Richard when they were children.[29] During the call, Scott also informed Tracy that in about 1968 or 1969, when Melanie and him were children, a fight broke out between Richard and Rhoda after Melanie had informed their mother of the abuse.[30]

---

[24] The allegations of sexual abuse are not direct claims in the petition presently before this Court. The Court takes notice of the testimony in relation to the subject only for its relevance, to any effect, on the validity of the 2016 wills and trust of the Testators.

[25] Tr. 247:5–10.

[26] Tr. 247:5–24.

[27] Tr. 249:14–19.

[28] Tr. 249:14–19.

[29] S. Burd Dep. 21:18–22:12; RX 27 at 1; Tr. 242:21–243:11.

[30] S. Burd Dep. 24:3–18.

Tracy, worrying for the safety of her young children, took these allegations very seriously and took the steps necessary to ensure their safety, including consulting a therapist, distancing her family from her father, and ensuring that her children were not left alone with Richard.[31] After a period of time of limited contact with her father, Tracy organized a family meeting with her therapist present, to confront her father with these allegations in order to gain some clarity on the situation.[32] Scott did not feel it was appropriate to approach their father with these allegations and felt as though if they did it should be done in a specific way after a nondescript period of time had passed.[33] Scott was invited to attend the therapist intervention with Richard via telephone but did not join the call.[34] It was after this call that Tracy started to repair her relationship with her father, and at trial testified that she is proud to say her parents and her were successful at doing so.[35]

When Richard was confronted with the sexual assault allegations, he denied them and continued to deny them during his testimony at trial.[36] When he first learned of the allegations, Richard contacted Scott by email asking him why he made

---

[31] Tr. 243:10–23; 244:4–11.

[32] Tr. 244:16–21.

[33] RX 18; Tr. 32:13–19.

[34] Tr. 244:22–23.

[35] Tr. 244:22–245:5.

[36] RX 22; Tr. 170:20–171:12.

these allegations.[37] Scott responded telling his father that his only concerns were his current financial situation and that he was open to communicating with his father to repair their relationship.[38] Despite this sentiment expressed by father and son to mend their relationship, the two had not been in contact with one another since 2010.[39] Richard had attempted to reach out to Scott in 2011 by letter, but the letter was returned as the wrong address on September 15, 2011.[40] Richard no longer knew where Scott lived and did not make any other attempts to contact him through other means.[41]

While she was looking into the allegations, Tracy emailed Richard, Barbara, and Scott on March 13, 2010 and provided a detailed account of all the events leading related to the sexual abuse allegations, up to the date of the email, including a statement that said Melanie told her personally over the phone that she was sexually abused.[42] In the email, Tracy also relayed her own opinion that she did not believe it was their father that sexually assaulted Melanie, but possibly one of their father's friends or someone else that lived in their building.[43]

---

[37] RX 20.

[38] RX 22; RX 23; Tr. 157:1–11.

[39] Tr. 159:16–18.

[40] RX 28; Tr. 158:15–159:5.

[41] Tr. 159:6–18.

[42] RX 27 at 1–3.

[43] RX 27 at 1.

## C.      Richard and Barbara Burd's Estate Plans

Richard and Barbara executed their original estate planning documents, consisting of their respective wills and trusts, with the assistance of counsel on September 14, 2001.[44] Barbara and Richard's Trusts divided the remaining Trust assets after their death as follows: (1) 70% to Tracy; (2) 15% to Scott; and (3) 15% to Melanie.[45] This distribution was calculated with the assumption that Barbara and Richard would split their assets in half, then all of Barbara's 50% would go to Tracy, and Richard's 50% would be split 20% to Tracy, 15% to Scott, and 15% to Melanie.[46]

In 2016 Richard and Barbara sought out legal counsel to make changes to their estate plans.[47] Richard and Barbara sought out Kevin O'Brien to make changes to their estate plan and met with him alone.[48] Richard and Barbara met with Kevin O'Brien in person on at least two occasions, once to discuss the changes to be made to their estate plan and once to execute their estate planning documents.[49]

On September 14, 2016, Richard and Barbara executed new wills and each signed revocations of their prior trusts, and executed a new trust titled "Joint

---

[44] Tr. 217:2–22; RX 4; RX 5; RX 6; RX 7.

[45] Tr. 218:8–12; RX 4 at 6, section E; RX 5 at 6, section E.

[46] Tr. 218:10–22.

[47] Tr. 219:4–16.

[48] Tr. 220:19–221:12.

[49] *See* RX 30 in which Kevin O'Brien memorializes their first meeting by letter sent on September 6, 2016. Tr. 190:6–12.

Revocable Trust of Richard Henry Burd and Barbara Lee Burd" with the help of an attorney, Kevin O'Brien.[50] On the same day, Barbara and Richard set up Durable Powers of Attorney, medical powers of attorney, durable medical directives, and a deed of transfer of their home into the new joint revocable trust.[51] The wills were witnessed by two individuals working as law clerks in Kevin O'Brien's law office that were present in the room when both Barbara and Richard signed their respective wills.[52]

The most notable change made by Barbara and Richard in their 2016 wills were their expressed disinheritance of Scott and Melanie.[53] Both Richard and Barbara cited their increasingly distant relationship with Scott, his lack of children, and the assumption he would inherit from his mother's estate, as the reason for them disinheriting him.[54] Richard stated that he decided not to include Melanie in his 2016 estate plan because he felt as though the $300 a month she was receiving from the annuity was enough.[55] Barbara and Richard both testified at trial that the assault

---

[50] Tr. 149:12-150:3; RX 32; RX 33; RX 34; RX 35; D.I. 4, exhibit 3.

[51] RX 37; RX 38; D.I. 4, exhibit 3; Tr. 189:19–190:6.

[52] Tr. 192:2-17; RX 32; RX 33.

[53] RX 32; RX 33.

[54] Tr. 240:3–12; Tr. 223:5–16.

[55] Tr. 154:3–11.

allegations had no effect on the 2016 estate planning and their decision to not include Scott and Melanie in their final wills and trust.[56]

At trial Dr. David Maleh, M.D., Richard and Barbara's doctor, testified that both Richard and Barbara were of sound body and mind in 2016 at the time they executed their estate planning documents.[57] Nobody, as of trial has needed to act as attorney in fact on Barbara or Richard's behalf under their respective Powers of Attorney.[58]

Tracy was not informed of the changes made to her parents' estate plans until July or August 2023.[59] Tracy had not been formally introduced to Kevin O'Brien until August 2023.[60] A meeting took place with Kevin O'Brien in August 2023 to review Barbara and Richard's Estate planning documents, and at this meeting it was decided that a premortem letter should be sent to Scott.[61] Kevin O'Brien testified that it had become a general practice for their firm to send premortem letters when

---

[56] Tr. 159:19–160:2; Tr. 230:20–231:6.

[57] Tr. 106:6–12; Tr. 106:19–107:12; Tr. 108:1–4.

[58] Tr. 228:22–229:1; Tr. 245:19–21.

[59] Tr. 245:6–14.

[60] Tr. 245:15–18.

[61] Tr. 201:16–202:12.

a child was disinherited.[62] Richard claimed that this letter was sent to protect themselves from any conflicts relating to Scott and the allegations he had made.[63]

On August 7, 2023, a premortem letter, labeled as a "Notice of Limitation," was sent to Scott, notifying him of his father's change to his estate plan and telling him that if he did not challenge the validity of the documents within 120 days, then he will have waived any right to contest the distribution of the estate under these changes thereafter.[64]

### D.     Procedural Posture

On November 20, 2023, Scott initiated lawsuit against Tracy in her capacity as Trustee of the Revocable Trust of Richard and Barbara, as Executrix of the wills,[65] and as attorney in fact for Richard.[66] In his petition, Scott pled two counts; (1) Undue Influence and  (2) Financial Elder Abuse.[67] On December 21, 2023, Tracy answered the petition and counterclaimed seeking declaratory judgement that Richard and

---

[62] Tr. 202:2–12.

[63] Tr. 171:14–19.

[64] RX 45. Throughout trial, Scott was clearly under the impression Richard and Barbara Burd were the ones who brought this action against him by serving him with this letter. Tr. 63:18–64:8. This letter is what prompted Scott to feel as though he had to answer the premortem letter within the stated time period to preserve any rights he believed he had. Tr. 15:10–16:1.

[65] Although Scott's petition identifies Tracy as the named executor in the wills of Barbara and Richard Burd, Tracy is identified as a potential successor executor. *See* RX 32 and 33.

[66] D.I. 1.

[67] *Id.* at p. 14 ¶¶465–590 and p. 18 ¶¶593–676.

Barbara had testamentary capacity when executing their 2016 estate planning documents and that their 2016 wills and trusts are valid.[68]

After a few discovery related issues,[69] a one-day trial was held on January 22, 2025.[70] Due to time restraints, the parties could not provide closing arguments, which Scott specifically requested time to provide, so closing summations were to be submitted in writing within 10 days.[71] Tracy submitted a post-trial brief on February 3, 2025.[72] Scott's closing arguments were not received until February 19, 2025, ten days after the ten-day deadline.[73] Tracy then filed a motion to strike for failure to submit in the 10-day time frame and for including testimony to the Court that had been ruled inadmissible during trial by sustained objection.[74] The motion was unopposed and eventually granted.[75]

## II.     ANALYSIS

The questions before this Court are: (1) whether the Wills and Trust of the Testators are valid, (2) whether Richard and Barbara lacked capacity at the time they

---

[68] D.I. 11.

[69] *See* D.I. 39, 41-42, 46, 50, and 59.

[70] D.I. 76.

[71] *Id.*

[72] D.I. 79.

[73] D.I. 80.

[74] D.I. 83.

[75] D.I. 86.

updated their estate documents in 2016, (3) whether Tracy unduly influenced her parents to change their estate planning documents in her favor, (4) whether there is evidence of financial elder abuse, and (5) whether the Respondent's attorneys' fees should be shifted to the Petitioner.

Under12 *Del. C.* § 1311, parties may validate a will before the death of a testator by giving notice to what is usually someone who expects to inherit under a will of their being disinherited and giving them 120 days to contest the will or otherwise waive their ability to challenge the document after the death of the testator.[76] Similarly, under 12 *Del. C.* § 3546, a revocable trust may also be validated before the death of the trustor.[77] The formal processes of pre-mortem will validation and limitation on action contesting the validity of a trust have not been followed here, but nonetheless Scott received a document titled "notice of limitations" informing him of his disinheritance and prompting him to initiate this action challenging the validity of his father and step mother's estate plans prior to their passing.[78]

For reasons, I will explain in further detail, I find the wills and trusts executed by Richard and Barbara are valid and not the subject of undue influence. I also find

---

[76] 12 *Del. C.* § 1311(a)–(c).

[77] 12 *Del. C.* § 3546(a)(1).

[78] RX 45; Tr. 64:21–65:2.

13

there is no evidence of financial elder abuse. Although unsuccessful in his claims, I don't find the Petitioner brought or prosecuted his claims in bad faith and thus deny the Respondent's request for fee shifting.

### A. The 2016 Wills and Trusts of Richard Burd and Barbara Burd are Valid.

For a will to be valid in Delaware, the person must be at least 18 years old and "of sound and disposing mind and memory[.]"[79] The will must be "(1) In writing and signed by the testator . . . and (2) Subject to § 1306 of this title, attested and subscribed in the testator's presence by 2 or more credible witnesses."[80]

Both Richard and Barbara's wills were signed by Testators, after they themselves took the initiative to seek legal counsel to draft the documents.[81] The wills are valid as they are in writing, signed by Richard and Barbara, and contain a notarized self-proving affidavit signed by each witness.[82] No evidence was presented that shows that Richard and Barbara were not "of sound and disposing mind and memory" such that they lacked capacity to execute a will. As discussed further below the Petitioner has failed to meet his burden of proof in showing that the Testators lacked capacity to execute their 2016 wills or that they were unduly influenced by

---

[79] 12 *Del. C.* §201.

[80] 12 *Del. C.* §202(a).

[81] Tr. 149:20–150:6; RX 32; RX 33.

[82] RX 32; RX 33.

14

Tracy in the execution of their wills. It is for these reasons I find that the Richard and Barbara Burd's respective wills executed in 2016 are valid.

Looking at the 2016 Trusts of Richard and Barbara Burd, under 12 *Del. C.* § 3545(a) a trust must be "in a writing executed by the trustor . . . and witnessed in writing in the trustor's presence by at least 1 disinterested person or 2 credible persons[.]" "[A] disinterested person is one who has no beneficial interest in the trust that would be materially increased or decreased as a result of the creation, modification or revocation of the trust[.]"[83]

The validity of a trust is determined by looking to the intent of the trustor to establish a trust.[84] The intent of the trustor can be expressed in writing or deciphered through extrinsic evidence such as acts or communications that occurred in the time surrounding the Trust's execution.[85]

The 2016 joint revocable Trust of Richard and Barbara Burd were in writing, signed by each of them as trustors, and was witnessed by two witnesses, evidenced by the signatures affixed to the bottom of the document.[86] The intent of the Trustors to create the trust is evidenced by their signatures and their present testimony that it was their intent to create the trust and to disinherit Scott. The 2016 trust of Richard

---

[83] 12 *Del. C.* § 3545(a).

[84] *Otto v. Gore*, 45 A.3d 120, 130 (Del. 2012).

[85] *Id.* at 130–32.

[86] D.I. 4, exhibit 3.

and Barbara are therefore valid. I conclude that the Trustors created the wills and trusts in accordance with the statutory requirements set forth above. I next turn to the issues of capacity and undue influence.

### i.     The Testators Had Capacity.

"Delaware law presumes that the [testator] had sufficient testamentary capacity when executing [his] will, and the party attacking testamentary capacity bears the burden of proof."[87] The standard for testamentary capacity provides that, at the time of execution, the testator must "be capable of exercising thought, reflection and judgment, and must know what he is doing and how he is disposing of his property. He must have sufficient memory and understanding to comprehend the nature and character of his act."[88] Only a "modest level" of competence must be present for an individual to possess the capacity required to execute a will.[89] Testators are presumed to have capacity, and thus a party contesting otherwise bears the burden of proof by a preponderance of the evidence.[90]

Scott testified that he asserted his lack of capacity claim based on the testator's age at the time the wills and trust were changed, however, age alone is not enough

---

[87] *McGee v. Est. of Hopkins, et. al.*, 2022 WL 17492353, at *5 (brackets in original) (quoting *In re W.*, 522 A.2d 1256, 1263 (Del. 1987)).

[88] *Matter of Langmeier*, 466 A.2d 386,402 (Del. Ch. 1983).

[89] *In re Vietri*, 2022 WL 3925995, at *6 (Del. Ch. Aug. 31, 2022) (quoting *In re West*, 522 A.2d 1256, 1262 (Del. 1987)).

[90] *Langmeier*, 466 A.2d at 389, 401.

to show a party lacked capacity.[91] Dr. Maleh, the doctor for Richard and Barbara, testified that in 2016 when he was the primary care physician for both parties, neither of them exhibited signs of mental challenges or concerns about their capacity.[92] Additional testimony from Kevin O'Brien, the attorney who assisted Richard and Barabara with their 2016 estate planning, shows that there was no question by their counsel about the capacity of Richard and Barbara in 2016 when they executed their wills and trust.[93] Furthermore, Richard and Barbara appeared competent throughout their trial testimony, answering questions from their counsel and recalling family events.

Scott also testified that, although he has had little to no contact with his father and Barabara since approximately 2009, his assertions that the two lacked capacity in 2016 were based in part on what he claimed to be "common sense," and because he recalled Richard insisted in the past that Scott would be in his will.[94] He believes it is reasonable to conclude that Richard's mind would not have been able to handle the sexual assault allegations in 2016.[95]

---

[91] Tr. 116:12–18; *IMO the LW & T of Hurly*, 2014 WL 1088913, at *4 (Del. Ch. Mar. 20, 2014) ("The Court cannot infer a lack of capacity solely based on a testator's advanced age[.]").

[92] Tr. 106:6–12; Tr. 106:19–107:12; Tr. 108:1–4.

[93] Tr. 199:10–200:7.

[94] Tr. 115:17–116:22; Tr. 121:17–24.

[95] Tr. 116:16–22.

Scott has failed to provide sufficient evidence to this Court to overcome the presumption that Richard and Barbara had the modest level of capacity necessary to be deemed competent to execute their wills and trust. As such, Scott's claim for lack of capacity fails.

### ii.　　　　There is No Evidence of Undue Influence.

Scott claims that his sister Tracy exercised undue influence against her parents by taking advantage of the circumstances in 2007 when both Tracy and Scott confronted their father with accusations that he committed sexual assault against Scott and his other sister Melanie over 40 years ago when the two were children.

"[A] duly-executed will is presumptively valid and free of undue influence, and the challenger carries the burden of proving undue influence."[96] The elements needed to establish undue influence are: "(1) a susceptible testator; (2) the opportunity to exert influence; (3) a disposition to do so for an improper purpose; (4) the actual exertion of such influence; and (5) a result demonstrating its effect."[97] "If any one of the elements is not proven, then the challenger to the will has not met [his] burden of proving undue influence."[98] In addition, in *Melson* the Delaware

---

[96] *McGee v. Est. of Hopkins*, 2022 WL 17492353, at \*5 (Del. Ch. Nov. 22, 2022) (citations and quotation marks omitted).

[97] *In re Melson*, 711 A.2d 783, 787 (Del. 1998) (quoting *In re Norton*, 672 A.2d 53, 55 (Del. 1996)).

[98] *McGee*, 2022 WL at \*8.

Supreme Court pronounced an important burden shift if three factors are present: "(a) the will was executed by a testatrix or testator who was of weakened intellect; (b) the will was drafted by a person in a confidential relationship with the testatrix; and (c) the drafter received a substantial benefit under the will."[99] If all three factors are met by clear and convincing evidence, the burden of proof shifts to the will's proponent.[100] "[T]he proponent of the will must [then] show that there was an absence of undue influence and prove by a preponderance of the evidence that 'the testator or testatrix possessed the requisite testamentary capacity.'"[101]

As explained in greater detail below, under the present circumstances where the Testators have sought out independent legal counsel on their own accord to draft their estate planning documents, the *Melson* factors would not apply and the burden of proof remains with the Petitioner, Scott.

Scott has not established by a preponderance of the evidence that the 2016 estate documents were the product of undue influence.[102] Although Scott testified

---

[99] *Melson,* 711 A.2d at 788 (citation and quotation marks omitted).

[100] *In re Seppi*, 2011 WL 4132374, at *12 (Del. Ch. Aug. 30, 2011). "The clear and convincing standard requires evidence that produces in the mind of the trier of fact an abiding conviction that the truth of the factual contentions is highly probable." *Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002) (cleaned up).

[101] *In re Hammond*, 2012 WL 3877799, at *3, n.10 (Del. Ch. Aug. 30, 2012) (quoting *Melson*, 711 A.2d at 788).

[102] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than

that Richard was approximately 84 and suffered mental, physical, and medical issues, Scott provided no evidence that Richard and Barbara were susceptible to undue influence at the time of the 2016 wills and trust execution.[103] As previously established above, both testators had sufficient testamentary capacity to execute a will. At the time the testators executed the wills in 2016, and up to this litigation, the testators remained independent, lived alone, and managed their own household and finances.[104]

Scott provides no evidence that would suggest Tracy had a disposition to exert undue influence against her parents and actually exerted undue influence. Although Scott testified that Tracy was in a confidential relationship with her parents and needed money from them to support her lifestyle, there was credible testimony from Tracy and Barbara that Tracy was unaware her parent's made changes to their prior wills and trust in 2016.[105] She was first made aware of this in August 2023, seven years after they had sought out an attorney and executed their wills and trust.[106] Furthermore, Scott's testimony that Richard was unduly influenced by Tracy

---

not." *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (citations and quotation marks omitted).

[103] Tr. 73:16–24.

[104] Tr. 135:4–136:1; Tr. 207:11–24; Tr. 209:2–16; Tr. 225:1–4; Tr: 152:21–153:2.

[105] R., Burd Dep. 48:10-50:4; Tr. 231:7–20; Tr. 245:6–18.

[106] Tr. 231:7–20; Tr. 245:6–18.

because Tracy used the alleged sexual assault against Richard to change his will and trust to favor Tracy appears unfounded and lacks credible evidence to support it.[107] Both Richard and Barbara testified this was not true and the reason Scott was removed from the wills and trusts, is simply because he was estranged from the family.[108]

Lastly, the undue influence claim also fails because the testators independently sought out the advice of an attorney to restructure their estate plan to disinherit their son, Scott.[109] They did so without the input of their daughter, who was not told of the new structure of her parent's estate plan until August 2023, after they had fully executed the documents.[110] Barbara testified that they did not even consider the prior allegations of sexual assault when updating their estate plan.[111] Richard provided coherent reasoning for changing his estate plan in 2016 to exclude Scott and Melanie. Melanie was removed because her parents, the Testators, were already helping her financially, while Scott was excluded because the two lost touch

---

[107] Tr. 32:8–19.

[108] Tr. 151:16–152:3; Tr. 153:19–154: 20; Tr. 220:13–221:18; Tr. 223:5–16.

[109] Tr. 149: 20–6; *In re Will of Cauffiel*, 2009 WL 5247495, at *9 (Del. Ch. Dec. 31, 2009) (citing *In re Estate of West*, 522 A.2d 1256, 1264 (Del. 1987)) ("Considerable weight is to be afforded to the testimony of a disinterested, independent attorney regarding lack of undue influence.").

[110] Tr. 186:11–187:3; Tr. 231:7–20; Tr. 245:6–18.

[111] Tr. 230:20–231:6.

and Richard wanted to help provide for his grandchildren, the children of Tracy.[112] Barbara testified to even more reasons they chose to leave Scott out of their estate plans including that he was financially stable, he didn't have children, and they were of the belief that he inherited assets when his mother passed away.[113]

Although Tracy under the new estate plan stands to inherit more than she did under the original, there is no "result demonstrating its effect" without any evidence of actions on her part that would be considered to have overpowered her parents' own willpower. It is for these reasons that I find the Petitioner has failed to meet his burden of proof regarding his allegations of undue influence.

### B. The Respondent Did Not Commit a Breach of Fiduciary Duties.

"A claim for breach of fiduciary duty is an equitable tort."[114] A party alleging breach of fiduciary duty is tasked with the burden of proving "(1) that a fiduciary duty existed and (2) that the defendant breached that duty." Scott claims that Tracy breached fiduciary duties owed to her parents by influencing them to disinherit him for her own benefit.

First, I look at whether a fiduciary duty existed. According to *Mitchell v. Reynolds*, "a fiduciary relationship is a situation where one person reposes special

---

[112] Tr. 223:5–22; Tr. 154:3–20.

[113] Tr. 240:3–16.

[114] *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *43 (Del. Ch. May 19, 2020).

trust in another or where a special duty exists on the part of one person to protect the interests of another."[115] These duties arise under the traditional roles and relationships such as Trustees, estate executors, and agents; however Delaware has recognized "outside a formally recognized fiduciary relationship, a relationship predicated on particular confidence or reliance may give rise to fiduciary obligations."[116] These confidential relationships can be shown where "circumstances make it certain the parties do not deal on equal terms but on one side there is an overmastering influence or on the other weakness, dependence or trust, justifiably reposed."[117]

Although the relationship between a child and an elderly parent will often evolve into one that is confidential such that the child must take control over an elderly parent's financial and personal decisions, here there is no evidence to suggest that Tracy and her aging parents had reached that stage of their relationship in 2016 when the estate planning documents had been drafted, nor did it appear that she had taken on that role in their relationship at the time of trial. At the time of trial, Richard was 93, and in 2016 when the estate planning documents were drafted, he was 84.[118]

---

[115] *Mitchell v. Reynolds*, 2009 WL 132881, at *9 (Del. Ch. Jan. 6, 2009) (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006)).

[116] *Mitchell* , 2009 WL at *9.

[117] *Id.* (quoting *In re Will of Wiltbank*, 2005 WL 2810725, at *6 (Del. Ch. Oct. 18, 2005)).

[118] Tr. 134:22–23.

There is no question that Richard was elderly when he made the decision to disinherit Scott, however Richard and Barbara remain competent, living independently, vacationing, maintaining their own home and household, and have yet to find a need to relinquish any control over their person or finances to Tracy or anyone else for that matter.[119] Tracy and her parents are not currently in a confidential relationship that would give rise to fiduciary duties. Scott provides no evidence that would suggest that Tracy and her parents' relationship was any different in 2016. Although Tracy was named in her parent's trust as Trustee and in separate documentation as her parent's power of attorney, she has not yet stepped into these roles or in any formal fiduciary capacity on her parents' behalf.[120]

Scott has provided no basis for the Court to treat Tracy as a fiduciary as no fiduciary relationship exists. Having concluded that there is no fiduciary relationship, it is safe to conclude there was no breach of those duties and Petitioner's claim for a breach of fiduciary duties fails.

### C. There is No Evidence of Financial Elder Abuse.

Scott alleges that Tracy committed financial elder abuse against their father. He alleges that "because [Richard Burd] was an elder at the time he was the victim of the Respondents' undue influence…respondent committed financial elder

---

[119] Tr. 135:4–136:1; Tr. 207:11–24; Tr. 209:2–16; Tr. 225:1–4; Tr: 152:21–153:2.
[120] Tr. 152:21–23; Tr. 186:11–23; Tr. 225:1–2.

abuse."[121] The relevant portions of 31 *Del. C.* § 3902(14) define "financial exploitation" as:

> the illegal or improper use, control over, or withholding of the property, income, resources, or trust funds of an elderly person or a vulnerable adult by an individual or entity for an individual's or entity's profit or advantage other than for the elderly person's or the vulnerable adult's profit or advantage. "Financial exploitation" includes any of the following: (a) The use of deception, intimidation, or undue influence by an individual or entity in a position of trust and confidence with an elderly person or a vulnerable adult to obtain or use the property, income, resources, or trust funds of the elderly person or the vulnerable adult for the benefit of an individual or entity other than the elderly person or the vulnerable adult; (b) The breach of a fiduciary duty, including the misuse of a power of attorney, trust,…; or (c) Obtaining or using an elderly person's or a vulnerable adult's property, income, resources, or trust funds without lawful authority, by an individual or entity who knows or clearly should know that the elderly person or the vulnerable adult lacks the capacity to consent to the release or use of the property, income, resources, or trust funds.

Scott argues that Respondent fits these criteria because his belief that she intimidated and unduly influenced Richard by using the sexual abuse allegations to make him change his will and trust to her benefit. For reasons previously stated, this allegation lacks merit and there was no evidence at trial that the Respondent unduly influenced Richard to transfer his assets to him upon death. Scott failed to provide

---

[121] D.I. 1 at p. 20 ¶¶644–67.

the Court with any evidence or specific testimony of actions taken by Tracy that would constitute financial elder abuse. Scott has failed to meet his burden and therefore I must find in favor of the Respondent.

### D. Attorney Fees and Costs

Tracy requests that the Court award fees and costs under the bad faith exception to the American rule and under 12 *Del. C.* § 3584.[122] Under the American rule "each party is generally expected to pay its own attorneys' fees."[123] A court may shift fees under limited circumstances "for bad faith conduct 'to deter abusive litigation and to protect the integrity of the judicial process.'"[124] This Court does not, however, lightly shift fees under the bad faith exception.[125] "A party seeking to shift fees must satisfy the stringent evidentiary burden of producing clear evidence of bad faith."[126] "To capture the sorts of vexatious activities that the bad-faith exception is intended to address, this court employs the 'glaring egregiousness' standard."[127]

---

[122] D.I. 79 at 53–55.

[123] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017) (citing *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005)).

[124] *Tigani v. Tigani*, 2021 WL 1197576, at *25 (Del. Ch. Mar. 30, 2021) (quoting *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017)).

[125] *Ravenswood Inv. Co. v. Winmill & Co.*, 2014 WL 2445776, at *4 (Del. Ch. May 30, 2014) ("The bad faith exception is not lightly invoked.").

[126] *Myers v. Acad. Sec., Inc.*, 2023 WL 6380449, at *1 (Del. Ch. Oct. 2, 2023) (ORDER) (citation and quotations omitted), adopted, 2023 WL 6846984 (Del. Ch. Oct. 16, 2023).

[127] *Seidman v. Blue Foundry Bancorp*, 2023 WL 4503948, at *6 (Del. Ch. July 7, 2023).

Tracy argues that fees should be shifted under the bad faith exception and categorizes Scott's actions in bringing this suit as 'misconduct' and asserts that Scott forced his father and stepmother to defend their estate plan.[128] With respect to Scott's actions during this lawsuit, Tracy has failed to prove that Scott engaged in glaringly egregious conduct. Although there are sensitive issues at play such as allegations of sexual abuse, strained familial relationships, and homelessness, there is not enough to find Scott's conduct to be glaringly egregious. Although Scott's allegations of sexual abuse were prevalent during this lawsuit, and his responsiveness to communications from the respondent and the Court throughout this proceeding were at times less than ideal,[129] Scott has pursued this litigation from states away while living in a homeless shelter and not having consistent access to a computer.[130] The Court is understanding of these circumstances and concludes his actions do not rise to a level of bad faith where shifting attorneys' fees would be acceptable. It is for these reasons that I decline to shift attorney's fees.

---

[128] D.I. 66 at 52–53; D.I. 79 at 54–55.

[129] At multiple points during this litigation Mr. Burd failed to participate in matters from scheduling issues to the pretrial stipulations between parties, to requests for production, to participating in depositions resulting in respondent's filing of multiple motions to compel primarily in pursuit of their own counter claims but still to resolve the very dispute brought on by Mr. Burd's own actions. *See* D.I. 39; D.I 50; D.I. 59.

[130] Tr. 16:7–13; Tr. 97:7–22.

With respect to Tracy's assertion that this claim was brought in bad faith to force Richard and Barbara to defend their estate plan, I also find that argument unconvincing. Scott testified that he did not simply wake up and decide to file this lawsuit.[131] Rather, the Petitioner filed this lawsuit in accordance with the notice of limitation he received from the Richard and Barbara's estate attorney.[132] Scott's petition indicates he was served with the notice of limitation on August 8, 2023, which gave him until December 6, 2024 to initiate judicial proceedings to contest the validity of the 2016 trust and wills of Richard and Barbara, of which he did just that.[133] It was known there was a chance Scott would file this lawsuit in response to the notice. Testimony shows the purpose of sending the notice was to "keep Scott 'from going after Tracy… at some later date.'"[134] I find Scott's lawsuit was filed not

---

[131] Tr. 90:22–91:3; Tr. 167:19–168:4.

[132] D.I. 1 at 2 ¶¶37–41; Tr. 13:23–14:2. Under 12 *Del. C.* § 3546, there is a limit on when a trust or an amendment to a trust can be challenged. In accordance with this statute, "A judicial proceeding to contest whether a revocable trust or any amendment thereto, or an irrevocable trust was validly created may not be initiated later than … [o]ne hundred twenty days after the date that the trustee notified in writing the person who is contesting the trust of the trust's existence, of the trustee's name and address, of whether such person is a beneficiary, and of the time allowed under this section for initiating a judicial proceeding to contest the trust provided… ." 12 *Del. C.* § 3546(1).

[133] D.I. 1, at p. 2 ¶¶ 38–39.

[134] D.I. 66 at 28. The Court also finds this argument that the respondent was forced into this litigation as unpersuasive. Respondent was interested in pursuing her counterclaim and at the March 1, 2024 teleconference when the Court indicated it would dismiss Scott's claim for failing to prosecute and respond to requests to schedule, the respondent insisted on moving forward in favor of her counterclaim.

in bad faith, but as a direct result of receiving the notice and his uncertainty as to why he was no longer a beneficiary.

Therefore, the request for attorney fees to be shifted to the Petitioner is denied. The Respondent is, however, entitled to costs as the prevailing party. Under Court of Chancery Rule 54(d), "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs." The Respondent is the prevailing party, and I find costs should be shifted to the Petitioner.

## III.    CONCLUSION

For all these reasons, I find in favor of Tracy, the respondent. Scott cannot meet his burden to prove that the wills and trust are not valid. As such, this Court declares that the 2016 wills and trust of Richard and Barbara are valid. The testators had capacity to execute the wills and trust, and that the Respondent did not unduly influence her parents or engage in financial elder abuse. Fees should not be shifted but the respondent is entitled to costs as the prevailing party. This is my final report, and exceptions may be filed under Court of Chancery Rule 144.[135]

---

[135] *See* Ct. Ch. R. 144(d)(1) (In "[a]ctions that are not summary or expedited… [a] party taking exceptions must file a notice of exceptions within 11 days of the date of the Final report or Draft Report.").